## Case No. 3,242.

### In re CORN EXCHANGE BANK.

[7 Biss. 400; 15 N. B. R. 431; 9 Chi. Leg. News, 254; 4 Law & Eq. Rep. 29; 15 Alb. Law J. 351.] [1]

Circuit Court, E. D. Wisconsin. April, 1877. [2]

BANKRUPTCY—PRIORITY OF DEBT DUE STATE.

The state has no claim for priority where the warden of the penitentiary deposits funds in his own name, as warden, in a bank which afterwards becomes bankrupt, the warden being liable to the state on his bond for the amount.

[Distinguished in Re Mellor, Case No. 9,401.]

[Appeal from the district court of the United States for the eastern district of Wisconsin.]

In bankruptcy. The warden of the state penitentiary received from the treasurer of the state, upon the order of the directors of the penitentiary, $10,000, and deposited it in the Corn Exchange Bank at Waupun, where the penitentiary was situated, in his name as warden. It was to the credit of "H. N. Smith, warden." He had an individual account at the bank at the same time, which was kept entirely distinct from his account as warden. It seems that there was at the penitentiary no safe place of deposit for the money used in defraying the expenses of the penitentiary, and which might be received as the proceeds of the articles manufactured by the prisoners and sold, and therefore, with the consent of the directors, the warden kept this account with the bank.

Almost immediately after this sum was deposited, the cashier of the bank absconded, and the bank failed, and was put into bankruptcy. The state now comes and claims that this money, deposited under these circumstances, was its money, and that the state has priority, and should be first paid in preference to some other creditors, and according to the mode of distribution pointed out in the bankrupt law.

[The proof of the claim was made on behalf of the state, and on application of the assignee the register expunged the claim. The case was then certified to the district court, which allowed proof of the debt (Case No. 3,243), and from that decision the assignee appeals.]

A. Scott Sloan, for the State.

E. P. Smith, for assignee.

DRUMMOND, Circuit Judge. The question is, whether the money was the money of the state, so as to entitle it to a preference over certain other creditors of the bankrupt. The district court found that it was. The question before this court is, whether that decision was correct. That depends very much, as well upon general principles, as upon the

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 4 Law & Eq. Rep. 29, and 15 Alb. Law J. 351, contain only partial reports.]

[2] [Reversing Case No. 3,243.]

particular legislation concerning the warden of the penitentiary, and the duties he was called upon to perform.

He was appointed by the directors; he was the superintendent of the penitentiary, and the treasurer. He could sue and be sued on contracts connected with the management of the penitentiary, and the supply of materials and provisions. Judgment could be rendered against him, and execution levied upon his property.

He received the proceeds of the labor of the convicts, and all money appropriated by the state for necessary disbursements. It should be added that he gave a bond, as required by law, in the sum of $20,000, for the faithful performance of his duties, and for the proper accounting for all moneys that should come into his hands. Now when he received the money, which, in one sense it might be said belonged to the state—that is, when he received it for the particular purposes of his office, either as the proceeds of the labor of the convicts, or as money directly appropriated by the state, was he the mere agent of the state, performing the duty of an agent without any property in the money? If he were, and had nothing to do but the performance of a duty as agent, then, if he lost the money, exercising proper care, or if it were taken from him he would not be accountable. An agent, it is well known, who is simply acting for his principal in keeping money, is not accountable to him for it in case of loss, provided he use reasonable care and diligence in keeping it. Now if, when the warden received, at Madison, the money, or drafts convertible into money, he had lost it in transit from Madison to Waupun, would it have been the loss of the state if he had exercised reasonable care? I think, as a public officer, having given bonds to the state, the state would have a right to say to him that he was not the mere agent for the keeping of this money; but that he had certain duties to perform in relation to it; that he had generally the disbursement of the money; that he could make contracts that contemplated the expenditure of the money; that he had certain personal duties and responsibilities in connection with it; that the state had trusted him with the money, but it was his, for the purposes for which it was placed in his hands.

It is said that the money was deposited in the bank with the consent and acquiescence, it may be under the instructions, of the directors of the penitentiary; still that did not discharge the warden from the duty he owed the state. The law does not clothe the directors, as I understand, with the power to say to him where he should keep the money, or what he should do with it. It may be, contracts were to be made, with the consent of the directors, but he, as the treasurer of the penitentiary, was himself empowered and required by the statute to do certain things in relation to the expenditure of the money.

He is intrusted with the safe keeping of the money, and there would seem to be no doubt that if there should turn out to be a deficiency here, after proper distribution, that the warden himself would be personally accountable for it to the state on his bond, and that he cannot rely upon the instructions of the directors to relieve himself from that responsibility.

At the time this case was decided by the district court, its attention was not called to a case in Massachusetts, reported in 11 Metcalf, 129, and which is in all essential particulars precisely like this. In fact, the material provisions of the law upon which the supreme court of Massachusetts decided that case, have been re-enacted in the statute of Wisconsin, and therefore that case is applicable to this, and that, curiously enough, was one arising out of the insolvency of a bank. The Phoenix Bank had loaned money to the state. It became insolvent, and its affairs were wound up under the law of Massachusetts. Under the claim against the state the question arose, whether the state had the right to set off certain deposit accounts which had been made in the bank by agents of the state, one of whom was a person who had the management of a bridge across the Charles river, and who was called upon to make disbursements for the repairs of the bridge, and with whom were placed the tolls of the bridge. And also, the bank had on deposit, at the time it suspended, certain moneys deposited by the warden of the penitentiary. It does not appear precisely from what source these moneys came into the hands of the warden.

The warden of the state prison, had deposited the sum of $11,930, which sum on the books of the bank stood credited to "Chas. Lincoln, Jr., warden of Mass. state prison, at Charlestown."

Now it will be observed that the court was required to determine whether the set-off should be allowed in each of these cases,—one, that of the agent of the Charles river bridge, and the other that of the warden of the penitentiary, and therefore the attention of the court was called to the particular circumstances connected with each deposit. In the one case (that of the agent of the Charles river bridge) the court decided that although the state might not have had a legal right to bring a suit, still that it had such an equitable interest in the fund deposited in the name of the agent of the Charles river bridge, that it could claim a set-off for that money against the claim of the bank for the money which had been loaned to the state. In the case of the warden of the penitentiary, the court decided that the state had no such equitable interest in that fund that it could set it off against the claim of the bank. The opinion of the supreme court of Massachusetts was given by Chief Justice Shaw, very high authority, and is very short. He says:

"Can the deposit made by the warden of

the state prison be set off? His authority and duty are regulated by the Revised Statutes, 144, sections 16 and 19. This demand stands upon a very different ground from that of the bridge agent,—a difference depending upon the very different provisions of law under which these agents are constituted. By the Revised Statutes, the state prison and its officers are constituted a separate and distinct establishment, having powers and functions, and being charged with duties and responsibilities of a peculiar nature." "It is provided that the warden shall have the charge and custody of all the real and personal estate, stock, tools and property pertaining to the prison." "That he shall receive and pay out all moneys granted by the legislature for the support thereof, and shall keep and render regular accounts." "It is provided that all contracts on account of the prison shall be made by the warden." "That the warden and his successor may sue and be sued thereon to final judgment and execution. That no such suit shall abate by reason of the office of warden becoming vacant, but that any successor of the warden pending such suit, may take upon himself the prosecution and defense thereof, and that upon motion of the adverse party, and notice, he shall be required to do so."

Similar powers and duties are conferred upon the warden by the law of Wisconsin. Indeed, it is claimed that they have been copied from the statute of Massachusetts. After having cited these provisions of the law of Massachusetts, the court says: "The court are of the opinion that in no sense can the money thus received and held by the warden of the state prison, in his official capacity, be regarded as the money of the commonwealth, or money in which the commonwealth has any equitable interest. The warden is liable to judgment and execution. Both the obligations of the warden, and the property to meet them devolve upon his successor. The statute contemplates that the commonwealth may have occasion to appropriate money from time to time, should the revenues of the prison be insufficient for its support. But to the extent of those revenues they are placed entirely under the control of the warden, he being subject only to apply them to the purposes of the institution, and to render an account of the manner of their disbursement. And we think it was the intention of the legislature to put the warden in such a situation of responsibility for all contracts made on account of the prison, that persons dealing with him, and making contracts, should not be barred of their legal remedies by being obliged to treat such contracts as made by the commonwealth, who are not liable in their sovereign capacity to be sued."

So that, unless this court should overrule the decision of the supreme court of Massachusetts on a statute, many parts of which have been incorporated in the law of Wisconsin, it must so rule this case; and the question which has occurred to the court is, whether that decision is sound under the law. Of course if the court was satisfied that it was not a correct decision, it is not binding as authority upon this court; but after the best reflection I have been able to give the subject, I am inclined to think a sound rule is there laid down. I have already stated that in my opinion the warden cannot relieve himself from responsibility in relation to the funds which, in one sense, it may be, belonged to the state, by showing that he has exercised due care over them; that he has been guilty of no fault or negligence. I think as a matter of public policy, he is bound to account absolutely to the state for the funds that have been placed in his hands. And it seems to me this consideration acquires additional strength from the fact that the law makes him personally responsible on his contract, and liable to judgment and execution. If he had made a contract for the supply of provisions for the penitentiary, and the state had paid over to him the money necessary to meet that contract, and he had deposited it in a bank to his credit as warden of the penitentiary, and he had been sued upon the contract, judgment obtained, and execution issued against him and in the hands of a sheriff, liable to be levied upon his property, could the state come to him and say, "This is not your money; you have no right to use it for the payment of this debt?" Would not, on the contrary, the warden have the right to say, "This money has been intrusted to me for this among other purposes, and you cannot recall it? Responsible as I am under this contract, it is my legal right to hold it and to meet my liability, to relieve my own property from seizure under this execution." I can have no doubt that he would have the right so to do.

A case has been cited which was decided by the supreme court of the United States. Bayne v. U. S., 93 U. S. 642. Of course, if that case, fairly considered, ruled this, this court would follow it; but I think it does not.

That was a case where a paymaster of the army had received $200,000 of the public money for disbursement in the usual way, it is to be presumed, by him as paymaster. He had deposited the money in a bank in Washington. He thereupon entered into a fraudulent conspiracy with Bayne & Co., by which he allowed them, as the result of this conspiracy, to take control of the money for their own purposes, they knowing that it was money which he had as paymaster, and which of course belonged to the United States.

The company became bankrupt, and the question was, whether, under the circumstances, the government had a right of priority of payment as to a portion of this

money which this company had received, as against the other creditors; and it was decided by the supreme court that the government had this right of priority. But why did the supreme court so decide? It was because it was received by Bayne & Co. in pursuance of a fraudulent conspiracy, they knowing it was the money of the government, and held by the paymaster as public money.

The court say that the law imposes on the firm an obligation, and implies a promise on its part to refund the money. Such a promise can be enforced by action.

Now, if the paymaster, as to the money in his hands, occupied the same relations to the government of the United States, that the warden of the penitentiary did to this state; or if the Corn Exchange Bank, of Waupun, had the same relations to the state that the insolvent firm of Bayne & Co. had to the United States, then this decision would apply. But it is obvious from what has already been said, that the distinction between the two cases, between the obligations of the insolvent firm and those of the Corn Exchange Bank, of Waupun, the one to the United States, the other to the state, and the duties of the paymaster in relation to the money, and those of the warden in relation to the money he had, are entirely distinct, and so different as really to prevent that case from being a binding authority upon this court, under the facts in the case before me.

Therefore, I shall reverse the decision of the district court, and hold that the state is not entitled to a preference over the other creditors for the money which is claimed.

I have assumed the liability of the warden on his bond to the state for the amount. If I thought the state had not this remedy, possibly I should feel inclined to look with a little more favor upon the application which has been made for a priority, but presuming that the state has ample remedy against the warden and his sureties, and believing, that the decision of the supreme court of Massachusetts is a case precisely in point, and under a law, which, so far as it affects the decision of that court, is the same as the law of Wisconsin, I must hold that the state is not entitled to priority over the other creditors. Of course the warden will be allowed, as a general creditor, to prove his account.