In re WRIGHT et al.

(District Court, D. Massachusetts. July 21, 1899.)

No. 454.

1. BANKRUPTCY—PROOF OF DEBTS—CLAIM FOR HIRE OF CONVICT LABOR.
   A claim for money due by a bankrupt as the price of convict labor hired by him from a county house of correction, under St. Mass. 1887, c. 447, § 11, is provable against his estate in bankruptcy by the county.

2. SAME—PRIORITY OF CLAIMS—DEBT TO COUNTY.
   A state insolvency law, although its operation upon insolvents is suspended during the existence of the national bankruptcy law, remains a "law of the state," within the meaning of Bankrupt Act, § 64b(5), which gives priority of payment out of bankrupts' estates to debts which are entitled to priority under the "laws of the states or the United States"; and consequently, where a law of the state makes a debt due to a county a preferred claim in insolvency, it will be entitled to priority of payment in bankruptcy.

In Bankruptcy.

Thatcher B. Dunn and James A. Stiles, for trustee in bankruptcy.
George S. Taft, for Worcester county.

LOWELL, District Judge. In this case the county of Worcester sought to prove as a preferred debt against the bankrupts' estate a claim for money due by the bankrupts as the price of the labor of convicts in the county's house of correction. The trustee contends: First, that the debt was provable only by the master of the house of correction, being owed to him individually, and not to the county; and, second, that, even if provable by the county, it is not a preferred debt, under the present bankrupt law.

1. Was the debt in question owed to the county of Worcester, and provable by it? Clearly the beneficial interest in the claim against the bankrupts' estate was in the county. The county was entitled, by statute, to receive the money due in payment for the labor of prisoners in its house of correction. St. Mass. 1887, c. 447, § 11. The county paid the bills for tools, implements, and materials purchased, and the salaries of persons employed in dealing with the convict labor. Id. § 4. It seems that the purchase of these tools, implements, and materials, and the payment of these salaries, were the only expenses contemplated by the legislature in the carrying out of the plan embodied in the statute of 1887. If any other expenses were involved, however, they also would be paid by the county, with the ordinary bills for the support of the house of correction. Pub. St. Mass. c. 220, §§ 53, 54. St. Mass. 1887, c. 447, has been frequently amended, but the amendments have not changed materially the relations of the master of the house of correction to the county. St. Mass. 1898, c. 277, referred to in argument by counsel for the trustee, was passed after the contract made with the bankrupts in this case, and after much of the work in question had been done, but its whole tenor indicates that the legislature did not suppose that it materially increased or diminished the master's

powers. The appropriation of the receipts from the labor of the prisoners to pay the expenses of maintaining the industries in the house of correction seems to have been copied somewhat blindly from chapter 259, where it is needed. Even if unnecessary in chapter 277, however, it cannot be taken to indicate that, either before or after the passage of the last-mentioned statute, the receipts belonged to the master individually, or could be used by him as his own money. His use of these receipts to pay for supplies seems to have been permitted by the treasurer of the county in order to avoid circuity of payment. The irregularity of this use cannot defeat the claim of the county.

The principal argument against holding this debt to be owed to the county is based upon Com. v. President, etc., of Phœnix Bank, 11 Metc. (Mass.) 129. In that case the commonwealth of Massachusetts sought to set off against a debt due by the commonwealth to an insolvent bank a deposit made in the bank by the warden of the state's prison. The court held that the deposit could not be set off, but that the money received and held by the warden in his official capacity could ' not be regarded "as the money of the commonwealth, or held in trust for the commonwealth, or money in which the commonwealth has any equitable interest." "The law provides, in effect," said Chief Justice Shaw, "that all persons dealing with the warden shall be placed, for all purposes of legal right and remedy, in the same condition as if dealing with an individual person. Perhaps the legal condition in which the warden is thus placed bears the nearest analogy to that of a corporation sole. He holds the property, and makes himself liable to suits, for the time being, qua owner; but the property, obligations, and duties, on his ceasing to hold the office, devolve on his successor, and not on his personal representative." "It is provided that all contracts on account of the prison shall be made by the warden, and his successor may sue or be sued thereon to final judgment and execution." With the greatest respect for the authority of the chief justice, it is difficult to follow his reasoning in this case, and especially that part of the reasoning which relates to the warden's liability to judgment and execution. If the statute made the warden individually liable upon his contracts as warden, then it might well be that his receipts as warden were at his personal disposal, subject only to his accounting with the commonwealth as its debtor. But, if his condition was analogous to that of a corporation sole, he was not liable to execution de bonis propriis, and the execution could have been levied only upon the property which was in his hands by virtue of his office as warden. Again, the provision requiring a warden's successor to take upon himself the prosecution and defense of any suit brought against the warden made it unlikely that an execution could issue against the warden de bonis propriis. It could hardly be that the legislature intended to make the warden liable de bonis propriis, not only upon the contracts made by him in his official capacity, but also upon the contracts made officially by his predecessor. If, however, execution could not be levied upon the individual estate of

the warden, then it is submitted that the argument that the commonwealth had no equitable interest in the money received by him in his official capacity would be greatly weakened. If he was not individually liable upon his contracts as warden, why should he have a beneficial interest in the warden's receipts? In whom could the beneficial interest inhere, except in the commonwealth? Can it be said that a public officer, as such, has the whole beneficial interest in the money which he receives in virtue of his office? In Re Corn Exchange Bank, 7 Biss. 400, Fed. Cas. No. 3,242, Judge Drummond followed Com. v. President, etc., of Phœnix Bank, and stated explicitly that a warden was liable to execution de bonis propriis; saying that the warden had the right to use the money intrusted to him to pay debts contracted by him as warden, in order that he might relieve his own property from seizure on execution. From this reasoning it would seem to follow logically that the warden could use the money held by him as warden to pay his own private debts, and that the money so held by him could be levied upon to satisfy an execution obtained against him for a private debt. If the conclusion be sound, doubtless debts for convict labor should be proved by him personally, but this use of the warden's receipts can hardly have been within the contemplation of the legislature. Unsatisfactory as is some of the reasoning in the two cases just cited, this court is bound to follow the former, as an authoritative interpretation of the statutes of Massachusetts, upon which statute the rights of counties and their officers depend. But the condition of the master of the house of correction is unlike that of a warden, in some particulars of the warden's office dwelt upon by Chief Justice Shaw. The master has no control over the revenues of the house of correction, but is bound to turn over to the county, at short and stated intervals, the money he has received. He has no power to disburse money. The debts which he incurs as master are to be paid by the county. It is almost inconceivable that an execution recovered against him on a contract which he has made as master can be levied upon his private property. It is unlikely that it can be levied upon the property of which, as master, he has temporary custody. In the ordinary course of things, he will hold very little such property at any one time, as he is compelled by statute to pay it into the county treasury once a month. The receipts are appropriated to pay the expenses, indeed, but all payments must be made by the county treasurer. It is true that the master is liable to suit, and this provision is doubtless derived from a like provision concerning the warden, but this provision alone cannot overcome the strong presumption arising from the other particulars of the statutory system. Doubtless the judgment thus recovered against the master is to be enforced like a judgment recovered against the county. If it can be enforced only against the master, the state of the creditor is indeed perilous. Upon the whole, therefore, I do not feel disposed to extend by analogy the decision in Com. v. President, etc., of Phœnix Bank to the case of the master of this house of correction. State of Maine v. Gould, 11 Metc.

(Mass.) 220, decided only that under the statutes of Maine the warden was the proper party to bring suit, rather than the state of Maine. The decision did not involve any consideration of the equitable right of the state of Maine to the money to be recovered. See, also, Bayne v. U. S., 93 U. S. 642; In re Mellor, 10 Ben. 58, Fed. Cas. No. 9,401; In re Dodge, 4 Dill. 532, Fed. Cas. No. 3,949.

The irregularities of the master in making the contract, and in his treatment of the money coming to him, do not affect the decision. No objection was made in argument to the form of proof, as on a note rather than on an open account, and the referee's report allowing proof by the county of Worcester is confirmed.

2. Is the debt thus due by the bankrupt to the county of Worcester entitled to priority, under section 64b(5), as a debt owing to a person who is entitled to priority by the laws of Massachusetts? The law of Massachusetts relied upon is Pub. St. c. 157, § 104:

"In the order for a dividend under the preceding section, the following claims shall be entitled to priority, and to be first paid in full in their order: First, all debts due to the United States, and all debts due to and taxes assessed by this state, or any county, city, or town therein."

The trustee contends that this section is not now a law of the state of Massachusetts, because, as part of the insolvent law of Massachusetts, it has been suspended by the bankrupt law of the United States. The argument is more ingenious than sound. The bankrupt act of the United States does not repeal or altogether avoid the insolvent laws of the several states, but merely suspends their operation so far as they come in conflict with the bankrupt law, or intrude upon its province. Thus, in Ex parte Eames, 2 Story, 322, 325, Fed. Cas. No. 4,237, Mr. Justice Story said:

"My opinion is that as soon as the bankrupt act went into operation, in February last, it ipso facto suspended all action upon future cases arising under the state insolvent laws, where the insolvent persons were within the purview of the bankrupt act. I say future cases, because very different considerations would or might apply where proceedings under any state insolvent laws were commenced and were in progress before the bankrupt act went into operation."

The learned justice thus recognized that the state insolvent laws were not altogether avoided by the passage of the bankrupt act, but might still retain some force of their own, though their application had become extremely limited. That the insolvent laws of the states retain some force even during the existence of a bankrupt law, see Judd v. Ives, 4 Metc. (Mass.) 401; Appeal of Shepardson, 36 Conn. 23; Reed v. Taylor, 32 Iowa, 209; Bump, Bankr. (11th Ed.) 98. It is to be observed that, in most of the cases in which the "repeal" of the insolvent laws by the bankrupt act is asserted, the context shows plainly that the word "repeal" is used loosely. That the insolvent laws of a state are not altogether repealed or avoided by the passage of a bankrupt act of the United States has further been declared in several of the bankrupt acts of the United States. Thus, in the act of 1800, § 61, it was provided:

"That this act shall not repeal or annul, or be construed to repeal or annul, the laws of any state now in force, or which may be hereafter enacted, for the relief of insolvent debtors, except so far as the same may respect persons

who are or may be clearly within the purview of this act, and whose debts shall amount in the cases specified in the second section thereof to the sums herein mentioned. And if any person within the purview of this act shall be imprisoned for the space of three months, for any debt or upon any contract, unless the creditors of such prisoner shall proceed to prosecute a commission of bankruptcy against him or her, agreeably to the provisions of this act, such debtor may and shall be entitled to relief, under any such laws for the relief of insolvent debtors, this act notwithstanding."

The existing bankrupt act, in its last clause, provides that:

"Proceedings commenced under the state insolvent laws before the passage of this act shall not be affected by it." 30 Stat. 566, § 71b.

An insolvent law may be amended, repealed, or enacted by a state during the existence of the bankrupt law; and such amendment, repeal, and enactment will be valid legislative acts, though the operation of these acts in some respects be suspended while the bankrupt law continues in force. When the bankrupt law has been repealed, the insolvent laws of the states become operative; and, if amended during the existence of the bankrupt law, they doubtless become operative in their amended form. Counsel for the trustee sought in argument an analogy between the insolvent laws thus suspended and a law unconstitutional, and therefore void, but the analogy is very imperfect. To establish that the insolvent laws of the several states now upon their statute books are not "laws of the states," it must be shown that they are not laws at all; that they are wholly void, and not merely restricted in their application. Inasmuch, therefore, as the bankrupt act of 1898 expressly recognizes the existing validity of these insolvent laws as applied to proceedings commenced before the passage of the bankrupt act, and inasmuch as the insolvent laws revive, ex proprio vigore, on the repeal of the bankrupt law, it follows that the insolvent laws have not been made wholly void, but are still laws of the states which adopted them.

Again, the supreme court of Massachusetts has held that the priorities created by the insolvent law control, by analogy, the distribution of an estate in the hands of receivers. Jones v. Publishing Co., 171 Mass. 22, 50 N. E. 15. Is it clear that the passage of the bankrupt act so avoided the insolvent laws of Massachusetts as to change the rule of distribution thus declared in the case of receivers? The decision in Jones v. Publishing Co. has been substantially enacted into statute (St. Mass. 1897, c. 400):

"In the settlement of estates by receivers the following claims shall be entitled to priority and to be first paid in full in their order: First. All debts due to the United States, and all debts due to and taxes assessed by this commonwealth, or by any county, city or town therein."

Can it be contended that the last-mentioned statute also is repealed by the bankrupt act? And, if not, does it not make the county a person entitled to priority by the laws of Massachusetts?

These technical considerations are strongly sustained by considerations which are practical. Plainly, the phrase "laws of the states," in section 64b(5) of the bankrupt act, was intended to have some meaning; and yet, if the trustee is right in his contention, only some exceptional, accidental, and peculiar statutory priorities

were recognized by the bankrupt act, inasmuch as the laws of the states regulating priority are generally a part of the insolvent laws.

Even if by the passage of the bankrupt act the insolvent law of Massachusetts were so avoided that it has ceased to be a law of Massachusetts, yet nothing would prevent the legislature of Massachusetts, during the existence of the bankrupt law, from passing a statute establishing priorities. Such a statute would have almost its sole effect in establishing priorities under the bankrupt law of the United States. It would be simply a re-enactment of the rule regarding the distribution of insolvent estates which had prevailed by statute up to the passage of the bankrupt law. To suppose that congress meant to require such legislation by the states is unreasonable.

In Re Rouse, Hazard & Co., 33 C. C. A. 356, 91 Fed. 96, it was held that a claim for labor performed more than three months before the bankruptcy proceedings, and entitled to priority under the insolvent laws of the state, was not entitled to priority under the bankrupt law; but the decision was rested solely upon the ground that the specific provisions of the bankrupt act concerning labor claims were intended to override the provisions relating to wages made by the state statute. That the exemption accorded by the state statute would have been valid in the absence of the express provisions of the bankrupt act concerning wages was conceded. The bankrupt act makes no such specific provision for debts due to states, counties, and municipalities, and hence, by reference, adopts the statute of Massachusetts as part of its own provisions.

The debt due the county is entitled to priority. Decree of referee modified accordingly.