## In re BENNETT.

(Circuit Court of Appeals, Sixth Circuit. March 12, 1907.)

No. 1,603.

**1. BANKRUPTCY—DISTRIBUTION OF ESTATE—PRIORITIES UNDER STATE LAW.**

While a state law cannot of its own force determine priorities under a national bankruptcy law, Bankr. Act July 1, 1898, c. 541, § 64b(5), 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448], which provides that "debts owing to any person who by the laws of the state * * * is entitled to priority" shall be given priority in the distribution of the bankrupt's estate, adopts the law of the state, and makes it the applicable federal law in determining priorities.

[Ed. Note.—Effect of national bankruptcy act on state insolvency laws and on assignments for benefit of creditors, see note to Carling v. Seymour Lumber Co., 51 C. C. A. 11.]

**2. SAME—CLAIM FOR MATERIALS FURNISHED TO MANUFACTURING COMPANY— KENTUCKY STATUTE.**

Ky. St. 1903, § 2487, which provides, inter alia, that persons who shall have furnished materials or supplies for the carrying on of the business of any manufacturing company shall have a lien therefor on its property and effects involved in the business, when the same shall be assigned for the benefit of creditors, or shall in any way come to be distributed among creditors, whether by operation of law or by act of such company, which lien, as provided by following sections, is superior to any mortgage or incumbrance thereafter created, while it may not create a technical lien until the happening of one of the conditions mentioned, gives a substantial right in or inchoate lien upon the property from the date of the furnishing of the material or supplies which comes within the spirit and purpose of Bankr. Act July 1, 1898, c. 541, § 64b(5), 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448], and on the bankruptcy of the company entitles such a claim to priority over the claims of general creditors.

**3. SAME—STATUTES—CONSTRUCTION—KENTUCKY LIEN STATUTES.**

Ky. St. 1903, § 2494, which provides that "no lien provided for in this article" shall attach, unless a claim therefor is filed in the county clerk's office within 60 days after the last day of the last month in which any labor was performed or material was furnished for which the lien is claimed, refers solely to liens provided for in section 2492 for labor or materials furnished in the construction of works of public improvement, and has no application to the liens given by section 2487 for materials or supplies furnished to a manufacturing company in case of the distribution of its property among creditors, notwithstanding the general language "lien provided for in this article"; the two classes of liens having their origin in different statutes, which with a third were carried without substantial change into the article in question, and sections 2492 to 2495 inclusive comprising one of the prior acts, while section 2487 formed part of another.

**4. SAME—CLAIMS ENTITLED TO PRIORITY—EFFECT OF ASSIGNMENT.**

A claim which is given priority by Bankr. Act July 1, 1898, c. 541, § 64b(5), 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448], because of a state statute by which the right of priority is given to the debt, and not to the creditor, may be assigned before bankruptcy, and the right of priority will pass to the assignee.

Petition to Review an Order of the District Court of the United States for the Eastern District of Kentucky.

O. T. Wimberly and A. R. Burnam, Jr., for petitioner.

John B. Baskin, for respondent.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

153 F.—43

LURTON, Circuit Judge. The question is whether the claims of the appellees against the bankrupt's estate were properly allowed priority of payment as debts which by the law of the state are entitled to priority under section 64b(5) of the bankrupt act. Act July 1, 1898, c. 541, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3448]. The bankrupt is a manufacturing corporation organized under the law of Kentucky, and doing business in that state. The claims are for materials supplied to and used in the business of the bankrupt corporation. Priority is claimed by virtue of section 2487, Ky. St. 1903. The trustee admitted the debt, but denied priority. The bankrupt court held that the debt was one entitled to priority under the statute referred to. From this judgment allowing the debt as a prior claim, the trustee has appealed, and also filed a petition for review.

If under section 2487, Ky. St. 1903, a priority is accorded to claims of creditors of such companies as the bankrupt corporation for materials and supplies furnished to carry on the business of the bankrupt, is that right of priority lost by reason of the operation of the bankrupt law? It is not a question as to whether the bankrupt law is a law superior within its field to a state law in the same field, but a question whether a priority given is preserved by the bankrupt law. This is answered by section 64b(5) of the bankrupt act. That provides that "debts owing to any person who by the laws of the state or of the United States is entitled to priority" shall be entitled to priority in the distribution of a bankrupt's general estate. Counsel for the trustee say that the Kentucky statute referred to above "applies only to the distribution of insolvent estates in the courts of Kentucky, and has no application to the distribution of estates under the national bankrupt law." It is idle to consider whether a state law can of its own force determine priorities under a national bankrupt law. No such contention is made or could be sustained. But it is another thing when the national bankrupt law prescribes that effect shall be given to state laws which do give priority to certain debts. The Congress might have dictated a single and uniform rule of distribution. If it had, that would have been the absolute law, notwithstanding state laws prescribing a different rule. But Congress has elected to prescribe as one rule of distribution that debts entitled to priority under any state law or law of the United States shall be accorded a like priority in the distribution of a bankrupt's estate. The law which we administer is thus the national bankrupt law; that is, the preference in bankruptcy, thus accorded, is a preference prescribed by the bankrupt law which for this purpose adopts the law of the state as the applicable federal law. This is the view which has been taken by many careful judges and accords with our own view.

In re Wright (D. C.) 95 Fed. 807, is a decision by Judge Lowell which was affirmed by the Circuit Court of Appeals in a case reported under the style of In re Worcester County, 102 Fed. 808, 815, 42 C. C. A. 637. In that case there was involved a priority given to the county under the insolvent laws of Massachusetts. It was held that this priority was preserved by section 64b(5) of the bankrupt act.

In the case styled In re Crow (D. C.) 116 Fed. 110, 112, a question arose as to whether a debt due by a bankrupt guardian to his ward was

entitled to priority by reason of a Kentucky statute, which provided that, in the distribution of an insolvent's estate, debts due as guardian should be preferred. Judge Evans very tersely sustained the right of priority, saying that:

"The bankrupt law does not in such cases supersede or mean to supersede the operation of the state law. On the contrary, the bankrupt act expressly recognizes the existence of the state statute, and makes that statute the basis for allowing priority of payment to certain classes of claims agains the debtor. Its effect is, in the most manifest way, to keep alive such provisions of the state law as give priority of payment, and while the bankrupt law, speaking generally, does by its operations supersede the force of any state laws which conflict with it the case before us presents an exception to the general rule, whereby the applicable provisions of the state law are expressly enforced through the bankruptcy act itself."

In Re Falls City Shirt Manufacturing Co. (D. C.) 98 Fed. 592, Judge Evans gave priority for a claim for rent because, under section 2317, Ky. St., such a claim was a lien upon the property of the renter upon the premises. He also sustained a claim under 2487, the provisions here involved.

In Re Daniels (D. C.) 110 Fed. 745, costs, incurred in an action against the bankrupt prior to the adjudication, which would constitute a preferred claim under the insolvency statutes of Rhode Island, were held entitled to priority under section 64b(5).

In Re Byrne (D. C.) 97 Fed. 762, a preference given by a statute of Iowa to labor claims was given a priority over a landlord's lien, because that was held to be the order of priority under the Iowa statute preserved by section 64b(5).

In Re Goldberg Bros. (D. C.) 144 Fed. 566, priority was given to costs incurred by an attaching creditor, because under the insolvent statutes of Maine priority was given to such costs "if the suit was commenced in good faith for the benefit of all the creditors."

In the case styled In re Laird, 109 Fed. 550, 554, 48 C. C. A. 538, the question was whether certain claims for labor were a prior charge upon the funds in a bankrupt trustee's hands. The result depended upon the construction of section 3206a, Rev. St. Ohio 1906. The applicable part was in these words:

"And in all cases where property of an employer is placed in the hands of an assignee, receiver or trustee, claims due for labor performed within the period of three months prior to the time such assignee, receiver or trustee, is appointed shall be first paid out of the trust fund in preference to all other claims against such employer, except claims for taxes and costs of administering the trust."

Judge Day, now Justice Day, for this court, said:

"It is not specifically stated in this connection that the claim in favor of the laborer thus to be preferred shall be a lien upon the debtor's property, but it is provided that, in the event property of an employer is placed in the hands of an assignee, receiver, or trustee, such claim shall be first paid out of the trust funds in preference to all other claims, excepting only taxes and costs of administering the trust. As the statute reads claims of all classes are to be postponed to the labor claims accruing within the period mentioned whether the same have theretofore constituted liens upon the property or not. It is the manifest purpose of this statute to give this class of claims a preference over all other demands whatsoever, with the exception of taxes and costs of administration."

The decision was, however, rested upon the proposition that the property came into the trustee's possession charged with the prior payment of the labor claims which was held to be, in legal effect and force, a lien created by the statute of the state, and thus not avoided by the bankrupt law. The learned and industrious counsel for the appellant have with modest earnestness contended that the cases cited, which sustain preferences given by state statutes, are not sound. They cite to support their view Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165, In re Allen (D. C.) 96 Fed. 512, In re Young (D. C.) 96 Fed. 606, and In re Beaver Coal Co. (D. C.) 107 Fed. 98. The claim for a lien for professional services denied in Randolph v. Scruggs was for services in preparing a deed of general assignment, which, having been made within four months of bankruptcy, was avoided as a consequence of the adjudication of bankruptcy. This deed of assignment provided that the fees of Randolph et al. should be first paid by the trustee thereunder; but the court said that the effect of avoiding the deed of assignment was to avoid it as a whole, and that the "appellants can assert no preference by way of lien under the deed." There was no claim of any preference under any state statute given to counsel preparing such an assignment. The assignment was valid under the law of that state, but when it was avoided the security provided by the deed for the professional services stood upon no better footing than the security provided by the same instrument for every other debt of the assignor. The case is not in point at all. In Re Allen the claim to a preference was for the costs of an attachment proceeding against the bankrupt, before bankruptcy, which was avoided as a consequence of an adjudication in bankruptcy. The only claim to a right to a preference grew out of the lien secured for the debt and costs by the attachment proceeding;. but, as that lien was avoided by the bankruptcy, the lien for the costs of the action went the same way. There was no statute of the state of California making the costs in such a proceeding a preferential claim in the distribution of the insolvent's estate, as was the fact under the law of Rhode Island and the law of Maine as applied in the cases touching costs, cited above, of In re Daniel and In re Goldberg Bros. The same criticism applies to In re Young. In re Beaver Coal Company is in conflict with the cases giving priorities to costs of proceedings against an insolvent set aside as an effect of a state insolvent law. Judge Bellinger does not seem to deny that a debt entitled to priority under a state law is preserved by section 64b(5) of the bankrupt law, but rather to hold that costs under the proceedings avoided by the bankrupt adjudication do not constitute a debt preferred under section 64b(5), although such costs would have been a preferred debt under the insolvent statute of Oregon.

That the unmistakable purpose of the Kentucky statute was to secure a priority to material and supply claims furnished to such a company, as described in the section heretofore set out, under almost every imaginable situation, we have no doubt. Thus a "lien" was declared to exist whenever the property of any such manufacturing company "shall come into the hands of any executor, administrator, commissioner, receiver of a court, trustee or assignee for benefit of creditors,

or shall in any wise come to be distributed among creditors, whether by operation of law or by the act of such company, owner or operator." By section 2490, the lien arises whenever "the debtor shall suspend, sell or transfer such business or when the property or effects engaged in such business shall be taken in attachment or execution, so that the business shall be stopped or suspended." By section 2491, this inchoate right to the appropriation of the property of such a debtor is declared to be "superior to the lien of any mortgage or other encumbrance thereafter created." That the technical "lien" of this article does not arise until the occurrence of one of the conditions mentioned may be true, and such is the intimation of the Kentucky Court of Appeals in Winter v. Howell's Assignee, 109 Ky. 163, 58 S. W. 591, and of this court in Ohio Falls, etc., Co. v. Central Trust Co., 71 Fed. 916, 18 C. C. A. 386.

But when, before the happening of one of the conditions which precede the technical "lien" of the statute, there exists from the origin of the debt a right to the ultimate application of the debtor's property to its payment, a right so tangible and specific as that it cannot be defeated by alienation, mortgage, or other incumbrance, nor by any process of law, receivership, assignment, or insolvency proceedings, a right which fastens itself so strongly that it adheres even after the death of the personal debtor, it is impossible to draw any very solid distinction between the equitable consequences of such a right and those of a full technical lien. The purpose of the postponement of the creation of the ripened lien until the happening of the events named would seem to be to give an equality of lien to all claims of like character then existing, rather than to each a "lien" from the date of the furnishing of materials and supplies. This purpose is not inconsistent with the acknowledgment of an inchoate right or incipient lien from the time of the furnishing of the materials, which becomes a ripened lien and fixed charge when the event happens which is named in the statute. Ohio Falls, etc., Co. v. Central Trust Co., cited above.

In Central Trust Company v. Richmond, etc., Ry. Co., 68 Fed. 90, 15 C. C. A. 273, 41 L. R. A. 458, we held that under section 2494, providing that no lien should attach unless the claim should be filed within the time there stated, that an inchoate or incipient lien originated with the beginning of the work or the delivery of the materials and continued as such incipient lien until perfected by the filing of the requisite notice or lost by failing to do so, as required. From the happening of one of the events named, the equitable or inchoate charge becomes a fixed lien and cannot be displaced by later debts. It may be that, if no "lien" in the technical sense of the statute existed when the bankruptcy occurred, no lien in the same sense could arise after bankruptcy. For the purposes of this case, we need go no further than hold, as we do, that this unfixed or incipient charge, a charge so effectual as to be incapable of defeat by any act of the debtor or of other creditors, or any proceeding by which the property shall "come to be distributed among creditors by operation of law or act of the debtor," manifests so plain a purpose that such debt shall be given priority as to come clearly within the spirit and purpose of section

64b(5) of the bankrupt act. Indeed, the decided cases go so far in preserving such an inchoate charge or incipient lien as to give to it all the effect of a lien. This is the plain teaching of our own case of In re Laird, heretofore cited, followed in Re City Trust Co., 121 Fed. 706, 58 C. C. A. 126.

A statute of New Jersey, giving to mechanics and materialmen a lien, provided "that no debt should be a lien, by virtue of this act, unless a claim is filed," etc., within a time named. Before this was done, bankruptcy of the debtor ensued, and it was claimed there, as here, that, as there was no technical lien when adjudication occurred, none could arise thereafter. Judge Blatchford, district judge, so ruled; but Judge Woodruff, on appeal, held that the lien attached as of the time of furnishing the materials, and reversed the ruling of the lower court. In re Dey, 9 Blatchf. 285, Fed. Cas. No. 3,871.

A statute of Pennsylvania provided that, when property upon rented premises and liable to distraint should be seized on execution, the officer making the sale should pay the rent due in preference to the execution creditor. The question was whether such rent due to a landlord should be first paid by the bankrupt estate which was liable to distraint. Justice Swayne, for the court, said:

"Before the commencement of the proceedings in bankruptcy, the defendants in error might have distrained, and it is agreed that the property upon the premises was more than sufficient to satisfy the demand. The statute of Pennsylvania of June 16, 1836, provides that, where property under such circumstances is seized and sold under execution, the rent due for a period not exceeding one year should be paid first out of the proceeds of the sale. This case is within the equity of that statute."

To the same effect are the cases of In re Hoover (D. C.) 113 Fed. 136, In re Duble (D. C.) 117 Fed. 794, and Wilson v. Penn. Trust Co. (3d Circuit) 114 Fed. 742, 52 C. C. A. 374, all under the Pennsylvania statute requiring priority of payment against an execution upon goods liable to distraint; In re Mitchell (D. C.) 116 Fed. 87, a case under a statute of Delaware which gave a preference to the landlord out of property upon the rented premises. See, also, In re Wynne, Fed. Cas. No. 18,117, In re Bowne, Fed. Cas. No. 1,741, and Kane Co. v. Kinney, 174 N. Y. 69, 66 N. E. 619.

We therefore conclude that the learned bankrupt judge did not err when he held that the claims of the appellees were debts entitled to priority under section 2487, Ky. St. 1903, although a technical lien had not ripened at date of adjudication, and that, under section 64b(5) of the bankrupt act, this right of prior payment would be enforced.

It is next objected that, under section 2494, Ky. St. 1903, appellees were required to file and record their claims in the county clerk's office within 60 days after the last day of the last month in which the materials were furnished, and that they did not do this, and that that section provided that no lien shall attach unless this filing is done. Judge Cochran, after an elaborate consideration of the question, reached the conclusion that section 2494 did not apply to the lien provided by section 2487. In this we concur upon the grounds stated in his opinion.

For a part of one of the claims here involved, the Hume Cooperage Company executed a note, and this note was assigned to one of the appellees. Proof of debt has been made by assignor as well as by assignee. The contention is that the statutory preference is given to him who actually furnishes the materials, and that an assignee cannot enforce the lien or priority conferred by the statute. Inasmuch as no statutory filing applies to liens claimed under section 2487, which comes from the act of 1876, the case of Frailey v. Winchester, 96 Ky. 570, 29 S. W. 446, which was based upon sections 2492 to 2495 and a part of the act of 1888, has no application, as neither the assignee nor assignor of a claim under 2487 is required to make the statement required to be made under the provisions which relate to liens under the other sections referred to. Neither does the case of Hutsell v. Banks, 102 Ky. 410, 43 S. W. 469, 39 L. R. A. 403, apply. In that case it was held that the assignees of a rent note could not collect it by the "extraordinary remedy" of distress. Inasmuch as the contingent right of lien under section 2487 does not depend upon the doing of anything by the creditor, there is no reason why a priority or lien, which attaches to the claim rather than to the claimant, shall not be assignable. The case falls under the earlier Kentucky decision of Graham v. Holt, 4 B. Mon. (Ky.) 61. That case accords with the general rule in respect of the assignability of preferential claims. Thus section 64b(4) of the bankrupt act gives a preference to "wages due to workmen, clerks, or servants which have been earned within three months before the date of the commencement of proceedings in bankruptcy. * * *" In Shropshire-Woodliff Co. v. Bush (decided January 7, 1907) 27 Sup. Ct. 178, 204 U. S. 186, 51 L. Ed. ——, the Supreme Court held that "the priority is attached to the debt, and not to the person of the creditor; to the claim, and not to the claimant," and that an assignee before bankruptcy might assert the claim and its priority. In Columbus, etc., R. R. Appeals, 109 Fed. 177, 48 C. C. A. 275, we held that a preferential claim, under the equity rule applied in the administration of an insolvent railroad, might be assigned, saying: "The preference attaching to a labor claim is to the claim, and not to the claimant, and passes with the claim to an assignee." See, also, Trust Co. v. Walker, 107 U. S. 596, 2 Sup. Ct. 299, 27 L. Ed. 490, and Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596.

• That personal security was taken by a note made by the debtor corporation did not operate to release the security afforded by the statute; there being nothing inconsistent with an intention to retain and rely upon the lien. Smith v. Wells, 4 Bush (Ky.) 92. Andrews v. Kentucky Citizens' B. & L. Ass'n, 67 S. W. 826, 23 Ky. Law Rep. 2418, is not in conflict, for the note there in suit was made in 1892, and the statute giving the lien claimed provided that the lien authorized by the chapter should have no effect "if security shall have been taken for labor performed or materials furnished." This provision was repealed by Acts 1896, p. 49. In Central Trust Co. v. Richmond Railroad Co., 68 Fed. 90, 15 C. C. A. 273, 41 L. R. A. 458, we held with reference to the lien given under sections 2492–2494,

Ky. St. 1903, that, while the right to the lien thus given might be waived by the acceptance of a contract to pay for the work in securities whose existence would be inconsistent with the existence of a lien, the waiver would be only conditional upon the performance by the debtor of his part of the agreement. See, also, Harris v. Youngstown Bridge Co., 90 Fed. 322, 33 C. C. A. 69.

We see no error in the decree, and it will accordingly be affirmed.

NOTE.—The following is the opinion of Cochran, District Judge, in the court below on granting the order herein sought to be reviewed:

COCHRAN, District Judge. Hiram Blow & Co., a creditor of the bankrupt, claims the right to be preferred in the distribution of its assets. The trustee and certain general creditors contest this claim, and the matter is before me for determination.

The bankrupt's business was that of a manufacturer of barrels, and the consideration for the indebtedness on account of which the preference is claimed was heading and staves sold to it to enable it to carry on its business. Sections 2487 and 2491, inclusive, Ky. St. 1903, the first five sections of article 3 of chapter 79 thereof, entitled "liens," confer certain rights on persons furnishing material or supplies to a manufacturer for the carrying on of his business and these sections form the basis of the claim to preference asserted herein. It is important at the outset, therefore, to understand clearly exactly what they provide, and what rights they confer. Section 2487 provides that the employés of any mine, railroad, turnpike, canal, or other public improvement company or of any rolling mill, foundry or other manufacturing establishment and the persons who shall have furnished materials or supplies for the carrying on thereof, shall have a lien on so much of the property and effects of such company, owner, or operator as may have been involved therein, and all the accessories connected therewith, including its interest in the real estate used in carrying on the business when its property and effects "shall be assigned for the benefit of creditors or shall come into the hands of any executor, administrator, commissioner, receiver of a court, trustee or assignee for the benefit of creditors or shall in any wise come to be distributed amongst creditors, whether by operation of law or by act of such company, owner or operator." By section 2490 it is provided that said lien shall also attach "when any such company, owner or operator shall suspend, sell or transfer such business or when the property or effects engaged in such business shall be taken in attachment or execution so that the business shall be stopped or suspended." Section 2488 provides that said lien shall be superior to that of any mortgage or other incumbrance created after the rendition of the services or furnishing of the materials, and as to wages coming due within six months to that of any mortgage or other incumbrance created before the rendition of the services. Originally the section provided for a superiority of the lien, both as to services rendered and materials furnished, without limit as to extent over a mortgage or other incumbrance created before the rendition of the one or the furnishing of the other; but by an amendment of date March 21, 1896, such superiority was cut down to six months' wages. Section 2489 provides that upon the happening of any of the contingencies by which the property and effects of the company, owner, or operator are put in process of distribution amongst creditors the business in connection therewith is continued to be operated by the party having them in charge, the net earnings thereof shall be distributed pro rata amongst the employés and materialmen. Section 2490 provides, in addition to what has already been set forth, that in case the lien attaches upon the happening of any of the contingencies set forth therein it may be enforced by proceedings in equity. And section 2491 provides that the plaintiff in such proceeding may unite with him as coplaintiffs any number of similar lienholders, shall make all lienholders and incumbrancers parties, and where the parties are numerous any one or more may be designated by the court to prosecute or defend for the class. It further provides in these words: "Suit must be filed to enforce the lien given by this article within 60 days from the date of the consignment or from the date when the

property shall go into the hands of a receiver or trustee or from the date when the business shall be stopped or suspended or the property sold; or the claims for which a lien is asserted must be filed in said time with the person authorized to receive and report claims."

The question has been raised and discussed as to when the lien provided by these sections attaches. Apparently, at least, it does not attach until the happening of one of the contingencies set forth in sections 2487 and 2490. On behalf of claimants, however, it is urged that it is to be implied from certain of the provisions in said sections that the lien attaches at the earlier date of when the services are rendered or materials are furnished. One of the provisions so relied on is that of section 2488, in relation to the superiority of the lien over a mortgage or other incumbrance created before the happening of any of said contingencies. This, however, is not inconsistent with the lien not attaching until the happening of one of said contingencies. A lien subsequent in time may be made prior in right. We have an instance of this in that section itself, in so far as it provides that the lien shall be superior to a mortgage or other incumbrance created before the rendition of services. Again, attention is called to the provisions of section 2489, that the earnings shall be distributed "amongst the persons to whom a lien is hereby given" and of section 2490, that "suit must be filed to enforce the lien given by this article within sixty days," etc. No implication, however, can be drawn from either of these provisions as to when the lien attaches.

Possibly support of the position that the lien attaches when the services are rendered or materials are furnished may be found in certain parts of opinions in certain cases involving statutes providing that, when an execution is levied on a tenant's goods, an officer having it shall first pay the landlord certain rent out of the proceeds of the goods when sold. In the case of In re Wynne, Fed. Cas. No. 18,117, the statute involved provided that no person having by deed of trust, mortgage, or otherwise a lien upon goods of a tenant on the leased premises should remove such goods without paying and securing payment of one year's rent due and to become due, and that any officer who might take such goods under legal process should pay out of the proceeds the rent in arrears and deliver to the landlord sufficient purchasers' bonds for the payment of that becoming due. Mr. Chief Justice Chase said generally: "Liens are of various descriptions, and may be enforced in different ways; but we think it sufficient to say here, what seems to us well warranted in principle and authority, that whenever the law gives a creditor a right to have a debt satisfied from the proceeds of property, or before the property can be otherwise disposed of, it gives a lien on such property to secure the payment of this debt." And concerning the statute involved therein he said: "We cannot doubt that this statute creates a lien in favor of the landlord and a lien of high and peculiar character."

In the case of In re Trim, Fed. Cas. No. 14,174, Judge Bryan, as to the effect of a similar statute, said: "This lien is not dependent on a distress warrant or an execution. The charge on the property or the proceeds of the property is a charge because of the statute. Where there is an execution, the charge is paramount to the levy itself. The very fact that it is paramount to the levy proves that it is a lien. * * * The statute creates the lien, not the execution. It creates a charge upon the property which excludes even an execution. The lien, so far from being created by the execution, ousts it. If it had not a previous existence, how could this be?"

But, however it may be as to statutes of this character, it can hardly be that in case of a statute, as here, expressly providing that a lien shall attach on the happening of certain contingencies, the lien attaches before they happen at an earlier date. And it has been expressly laid down by Judge Hobson, in the case of Winter v. Howell, that the lien provided by the statutory provisions in question herein does not attach until the happening of one of the contingencies set forth therein. In that case the owner of a manufacturing establishment had made an assignment on December 28, 1896, and an employé asserted a lien for one year's salary then due him for services rendered, which covered a period of time before March 21, 1896, the date of the amendment hereinbefore referred to. There was no mortgage or other incumbrance on the property assigned, so that the claimant's rights were in

no wise affected by the amendment. But for some reason the question as to whether they were was considered. Judge Hobson said: "It is insisted for appellant that his rights are to be determined by these statutes, and not by the statute in force at the time of the assignment, because his contract of service was made while the former acts were in force. This contention cannot be maintained, for the reason that the employés were given no lien until the assignment was made. Their lien, arising by virtue of the assignment, and not attaching to the property until it was assigned for the benefit of creditors, must be governed by the law in force when the assignment was made."

Judge Lurton said as much in regard to said lien in the case of Ohio Falls Mfg. Co. v. Central Trust Co., 71 Fed. 916, 18 C. C. A. 386. He there said: "But this lien did not actually attach so long as the property remained in the hands of the debtor railway company and was managed and operated by it on its own account."

To the same effect are certain statements of Judge Evans in the case of In re Falls City Shirt Mfg. Co. (D. C.) 98 Fed. 592, to wit: "The landlord's lien was in existence June 17, 1899, at and before the adjudication; but the property of the bankrupts certainly did not come into the hands of the trustee until after that time, and probably not until July 3, 1899, when the trustee was appointed and qualified. Not until that event did the lien of the materialmen arise or exist." And, again: "As already indicated, sections 2487 and 2488 give a lien to the materialmen only when the property goes into the hands of the trustee in bankruptcy and ipso facto that event. That event occurred July 3, 1899. This lien then became at once absolute and fixed."

There is no escaping, then, from the position that the lien in question does not come into existence or attach until the happening of some one of the contingencies set forth in sections 2487 and 2490. Until the happening thereof, the only perfected right which the employé or materialman has is a personal claim against the company, owner, or operator for the amount due him. As to the lien, his right is inchoate and contingent upon such happening. And yet, though it is an inchoate and contingent right, it is still a right. When he renders services or furnishes materials, he can safely act upon the idea that, if one of the contingencies does happen, his lien will attach; and others, when dealing with the company, owner, or operator, are bound to take notice thereof and to act accordingly. The company, owner, or operator is so hedged about by contingencies on the happening of which the lien will attach that the only way in which it can prevent its attaching is for it to retain the ownership of the property and effects engaged in the business and to keep the business going. If it transfers said property and effects to another, if they go into the hands of another for the benefit of creditors, if they are attached or levied upon under an execution, or if it ceases to do business, the lien at once attaches. And when it does attach it overrides a mortgage or other incumbrance created subsequent to the rendition of the services or furnishing of the materials; and, as to six months' wages, a mortgage or other incumbrance created prior to the rendition of the services.

In the case of Ohio Falls Car Mfg. Co. v. Central Trust Co., supra, Judge Lurton referred to this inchoate right of the materialman under the statutory provisions in question herein in these words: "The plain purpose of the act was that the furnishers of materials or supplies should be preferred in the distribution of the assets of an insolvent company over mortgages or other incumbrances theretofore or thereafter created. The most that can be said is that such a creditor, prior to the happening of one or the other of the conditions mentioned in the statute, had an unfixed right in the property of the debtor, amounting at most to an inchoate lien which could be perfected upon the occurrence of one or the other of the conditions precedent named in the statute and the beginning of legal proceedings for its declaration and enforcement within the time and in the manner prescribed by the statute."

Under the mechanic's lien law of New York, no lien attaches until notice of the claim is filed in the proper clerk's office. Judge Brown, in the case of In re Emslie (D. C.) 97 Fed. 929, refers to this feature of said law in these words: "The language of the present statute of New York seems to leave no doubt that the lien in this case does not arise upon doing the work or fur-

nishing the material, but only upon filing the notice of claim in conformity with the provisions of the statute, and it is only through this proceeding that the lien is created. It is the lodging of the claim under that statute that binds the property, just as the issuing of an execution to the sheriff under a judgment binds the debtor's goods and chattels."

Notwithstanding this, however, it was held by the Court of Appeals of New York, in the case of Kane Co. v. Kinney, 174 N. Y. 69, 66 N. E. 619, that a party who has furnished labor and material in the erection of a building has an inchoate right before the filing of a notice in the clerk's office, and such an inchoate right that upon filing notice after the making of a voluntary assignment for the benefit of all his creditors his lien will prevail over such assignment. Judge O'Brien said: "The object and purpose of the mechanic's lien law was to protect a person who with the consent of the owner of real property enhanced its value by furnishing materials or performing labor in its improvement by giving him an interest therein to the extent of the value of such material or labor. The filing of the notice of lien is the statutory method prescribed by which the party entitled thereto perfects his inchoate right to that interest. That is the manner and mode of procedure in which the right is asserted. A certain time is allowed in which the lien may be asserted or lost. During that time there is a preferential statutory right, in the nature of an imperfected equitable lien in favor of the laborer, mechanic, materialman, or subcontractor, and when a notice of lien is filed that right is perfected; but, until the 90 days allowed by the statute within which the lien may be filed have elapsed, the right cannot be defeated by the voluntary act of the party against whom it might be asserted, such as a general assignment for the benefit of creditors. If such were the effect of the assignment, no labor or materialman's claim would be secure, and the beneficial purpose of the statute could be defeated, unless a lien was filed at the time the work was commenced and from day to day thereafter. This, however, being a remedial statute, must be construed liberally with a view to carry out its intent and for the accomplishment of every beneficial purpose contemplated. It would therefore seem to be a reasonable conclusion that the assignee for the benefit of creditors takes the title to the estate of his assignor subject to this right of any lienor to assert his lien against the property or the fund within the statutory time; that is, within 90 days."

With this presentation of the provisions of said sections of the Kentucky statutes and the rights they confer, we are in position to determine the question of preference asserted herein. A convenient way to dispose of the matter is to take up and consider the various grounds urged on behalf of the trustee and contesting creditors in support of their contention that claimants are not entitled to the preference claimed.

1. It is so urged, on the ground that none of the contingencies upon the happening of which it is provided that a lien is to attach has happened, and claimants' inchoate right has not, therefore, become perfect.

It must be conceded that none of said contingencies has happened, and that claimants' inchoate right has not become perfect. It is true that the business of the bankrupt has been suspended; but the suspension was not prior to this proceeding, and was not the act of the bankrupt. It was brought about by this proceeding. The suspension contemplated by section 2490 is a voluntary suspension by the company, owner, or operator, and none other. It is true also that the property and effects of the bankrupt have by this proceeding been put in process of distribution amongst its creditors; but this mode of putting them in process of such distribution is not within the contemplation of section 2487. The only modes of so doing contemplated thereby are those specifically mentioned or some other possible mode of which the state courts would have jurisdiction, to which the general language used has reference. The Legislature of Kentucky had no power in and of itself to give any effect to a bankruptcy proceeding or to make provision as to how the property and effects of a bankrupt shall be distributed in such proceeding, and hence did not intend to do so. So it is that I am driven to the conclusion that none of the contingencies contemplated by sections 2487 and 2490 has happened, and plaintiff's inchoate right has never been perfected.

But does it follow from this that claimants are not entitled to the prefer-

ence claimed? I think not. There are two distinct grounds upon each of which separately and by itself it may be said that they are entitled to it. One of them may be termed the doctrine of equivalency. It is this: Though none of the contingencies contemplated by the statutory provisions in question has happened, that which is equivalent to certain of said contingencies, to wit, this proceeding, has come to pass, and its coming to pass has prevented the happening of any of the statutory contingencies. It is therefore equitable that the same consequences should follow from this proceeding that would have followed from the happening of one of said contingencies had it not intervened. As it has been put, the case comes within the equity of the statute. In the case of Longstreth v. Pennock, 20 Wall. 575, 22 L. Ed. 451, it was held that the assignee in bankruptcy should pay rent due from the bankrupt to his landlord for a period not exceeding a year prior to the bankruptcy before distributing the proceeds to the creditors generally, because of state statute providing that, where the property of a tenant is seized and sold under execution, rent due for such a period of time should be paid first out of the proceeds of sale, though no execution had been issued prior to the bankruptcy. Mr. Justice Swayne said: "This case is within the equity of the statute."

In the earlier cases of In re Wynne, supra, In re Bowne, Fed. Cas. No. 1,741, and In re Trim, supra, it was held that in the case of the existence of such a state statute the landlord should be first paid his rent before distribution in bankruptcy amongst creditors. The decisions, however, were not put on the ground that the case came within the equity of the statute, but upon the ground that the effect of the statute was to give the landlord a lien before the issuance of an execution, and the assignee in bankruptcy took the bankrupt's property subject to the existing liens.

The following later cases, to wit, In re Hoover (D. C.) 113 Fed. 136, In re Mitchell (D. C.) 116 Fed. 87, and In re Duble (D. C.) 117 Fed. 795, place the landlord's right to preference on the ground that the case comes within the equity of the statute. In the case of In re Hoover, supra, Judge Buffington said: "The bankrupt court having taken possession of this property thus liable for the rent, its process whereby the same was sold must for the purposes of this statute be regarded as an equitable execution. The case is within the equity of the statute." In this case a distress warrant had been issued and levied before the institution of the bankruptcy proceeding. In the case of In re Mitchell, supra, Judge Bradford said: "The right of the landlord, existing by law prior to the adjudication in this case, and requiring no act on his part for its creation and perfection, is, in my opinion, recognized and respected by the bankruptcy act. It is his right to be paid his accrued rent out of the proceeds of the goods and chattels in question which belonged to the tenant until they passed to the trustee in bankruptcy representing the creditors as a debt or demand payable in præsenti. * * * This right is entitled to recognition by the court in bankruptcy either as existing independently of the proceedings in bankruptcy, or as coming within the equity of the Delaware statute." In this case the preference allowed included rent to become due as well as rent already due. In the case of In re Duble, supra, Judge Archbald said: "This preference is preserved under the bankrupt act; the taking of the tenant's goods by virtue of its provisions being regarded as within the equity of the statute."

The case of Morgan v. Campbell, 22 Wall. 381, 22 L. Ed. 796, is in no way in conflict with these decisions. In that case there was no such state statute. The landlord simply had his common-law right of distress, and that right had not been exercised prior to the bankruptcy proceeding. It was held that the landlord's claim for rent was not entitled to preference. Though, in the case of Austin v. O'Reilly, Fed. Cas. No. 665, Mr. Justice Bradley held that the landlord was entitled to preference solely because of his right to distrain. His view as to the effect of a statute as to priority of payment in case an execution is levied on the tenant's goods is indicated in these words: "This right of the landlord has been regarded as peculiarly entitled to priority when by statute an execution creditor of the tenant is prohibited from removing the goods until he has paid the landlord's rent or a reasonable amount (generally a year's rent) which may have accrued. Then, in Longstreth v. Pennock, 20 Wall. 575, 22 L. Ed. 451, the Supreme Court places special em-

phasis on this fact." This case, though decided about two months after Morgan v. Campbell, seems not to have had it in view.

The doctrine of equivalency has been applied in analogous instances in another particular. In the case of In re Brunquest, Fed. Cas. No. 2,055, a mechanic's lien was involved. The statute required a statement to be filed in a certain time and suit to be brought in another certain time after the filing of the statement. No suit was brought within the required time, but the bankruptcy proceeding was instituted within the time in which suit was required to be brought. The mechanic did not assert his lien therein within that time. It was held that he had lost his lien, but conceded that if he had asserted his lien there in proper time it would have been preserved on the ground that such assertion thereof was equivalent to bringing suit. Judge Dyer said: "I think there can be no doubt that these lien claimants could, as an equivalent for commencing suits in the state courts, have asserted or proved their liens in the bankruptcy proceedings, within the time limited by the statute creating the liens; but this was not done. To preserve a statutory lien dependent for its continued existence upon observance of the terms, they must be complied with by performance of the required act or its equivalent." And, again: "My conclusion is that because of this failure either to commence a suit in the state court for the enforcement of these demands within four months after the filing of petitions, or to do that in this court which would be equivalent to the commencement of such suits, namely, to present the claims to this court in these bankruptcy proceedings within four months for recognition and enforcement, these liens must be said to have lapsed and cannot now be recognized."

In the case of In re Kerby Dennis Co. (D. C.) 94 Fed. 818, Judge Seaman also held that the assertion of such a lien in bankruptcy proceedings was equivalent to bringing a suit in the state court to preserve the lien. He said: "With the lien kept alive and identified as the statute directs, I have no doubt this court could furnish a remedy equivalent to the action in the state court."

In this particular the equivalent act preserves the lien created by a state statute. In the former particular it gives rise to the lien or preferred right contingently provided for by the state statute. Possibly it is upon some such ground as this that the ruling in the case of In re Grissler, 136 Fed. 754, 69 C. C. A. 406, is to be placed. It was there held that in New York, the peculiarity of whose mechanic's lien law has been heretofore referred to, the mechanic is entitled to a preference in bankruptcy if he files the notice of his lien within the statutory period, even though he does not do so prior to the institution of the bankruptcy proceedings. In referring to the decision of the New York Court of Appeals in Kane Co. v. Kinney, supra, Judge Wallace said: "The court distinctly decided that the inchoate right acquired by the materialmen when perfected by the filing of his notice of lien, though filed subsequent to a general assignment of the contractor for the benefit of creditors, was superior to the right acquired by the assignee. A trustee in bankruptcy of the contractor or subcontractor stands in no better position than would the general assignee."

In the earlier case of In re Roeber (D. C.) 121 Fed. 444, the same court had held otherwise; but this decision was overruled by the later case.

Somewhat of the same idea seems to have been controlling in the Massachusetts case of Jones v. Arena Pub. Co., 171 Mass. 22, 50 N. E. 15. It was there held that the priorities created by the insolvent law should control the distribution of an estate in the hands of receivers. Judge Barker said: "It would be a plain injustice if a general creditor by resorting to equity for the administration of its debtor's goods, merely for the reason that by its aid the amount to be divided would be larger, could gain a farther advantage by reducing to the level of common creditors workmen whose wages would have priority if the assets were left to be administered at law or could thus place his own debts upon an equality with taxes which would have been paid in full had not equity intervened. The defendant corporation was subjected to our insolvency law by force of St. 1890, p. 287, c. 321, and if equity had not come in to conserve and distribute its legal assets the wages of its workmen and the taxes due from it would have priority in the distribution of its assets by the usual agencies of the common law. These agencies could not keep its

business going until the enactment of St. 1897, p. 86, c. 120. For this reason only the creditors, merely to increase the amount of the fund, asked equity to interfere in behalf of all creditors alike. It would be unjust if that interference should be at the expense of the workmen and of the public through depriving claims for labor and taxes of the priority of payment which they would have had if equity had not intervened."

Judge Lowell, in the case of In re Wright (D. C.) 95 Fed. 807, 811, said that it was "by analogy" the Supreme Court of Massachusetts so held.

The other ground upon which claimants are entitled to the preference asserted, though none of the contingencies contemplated by the statutory provisions in questions has happened, is that the bankrupt act has expressly so provided. This it has done in section 64b(5). By that clause it is provided that, amongst debts having priority and entitled to be paid in full out of the bankrupt's estate, are "debts owing to any person who by the laws of the state or the United States is entitled to priority."

In the cases of In re Hoover, supra, and In re Mitchell, supra, the preference allowed the landlord was based upon this ground also. In the Hoover Case, Judge Buffington said: "Such liens and priority by virtue of the Pennsylvania statute was one recognized and enforced by section 64b(5) of the bankrupt act." And in the Mitchell Case, Judge Bradford said: "I have no doubt of the priority of the claim under section 64b(5) of the bankruptcy act as a debt owing to the landlord who by the laws of Delaware is entitled to priority over other creditors of the tenant."

In the case of In re Crow (D. C.) 116 Fed. 110, Judge Evans held that a balance due from a guardian to his ward was entitled to preference in the distribution of the estate of the guardian in bankruptcy by virtue of section 64b(5) of the bankrupt act, because the statutes of Kentucky provided that in the distribution of an insolvent's estate, whether under a general assignment for the benefit of creditors (Ky. St. 1903, § 74), or upon a conveyance in contemplation of insolvency being converted into such an assignment when attacked within six months (Ky. St. 1903, § 1910), or upon his death (Ky. St. 1903, § 3868), debts due by a guardian shall be paid in full before any payment is made to general creditors. He said: "I am of opinion that the bankrupt law does not in such cases supersede, or mean to supersede, the operation of the state law. On the contrary, the bankrupt act expressly recognizes the existence of the state statute, and makes that statute the basis for allowing priority of payment to certain classes of claims against the debtor. Its effect is, in the most manifest way, to keep alive such provisions of the state law as give priority of payment; and while the bankrupt law, speaking generally, does by its operation supersede the force of any state laws which conflict with it, the case before us presents exception to this general rule, whereby the applicable provisions of the state law are expressly enforced through the bankruptcy act itself."

It is suggested by counsel for trustee and contesting creditors that the claimant in this case would have been entitled to preference even if there had been no such state statutes, and Perry on Trusts (5th Ed.) vol. 1, § 345, and Collier on Bankruptcy (5th Ed.) p. 558, are cited as upholding this position. They simply recognize that, if the ward's estate can be traced in the hands of the assignee in bankruptcy or other trustee for benefit of creditors and identified, he is entitled to same as against the creditors. On the other hand, they lay down the proposition that, as such cannot be done in the absence of statute, the ward stands on the footing of a general creditor and has no greater rights. To this effect are the following decisions, to wit: In re Richard (D. C.) 104 Fed. 792; In re Marsh (D. C.) 116 Fed. 396; In re Mulligan (D. C.) 116 Fed. 715; In re Kurtz (D. C.) 125 Fed. 992. In the Crow Case there was no identification of any portion of the ward's estate in the hands of the assignee in bankruptcy. There was merely a balance due him from his guardian, and he was given preference solely on the ground heretofore stated.

The same counsel rely on the decision of the Supreme Court of the United States in the case of Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165, as against the position that a priority provided for in a statute touching assignments for benefit of creditors should by virtue of said clause be recognized in a distribution in bankruptcy. There it was held that a claim.

for professional services rendered to a bankrupt corporation in the preparation of a deed of general assignment valid under the law of the state where made was not entitled to be paid as a preferential claim out of the estate in the hands of the trustee in bankruptcy when the adjudication in involuntary bankruptcy was made within four months after the making of the assignment, and the assignment was set aside as in contravention of the bankrupt law. The right to the preference was not based on any statute of the state providing therefor, but on a provision in the deed of assignment. Of course, as that deed was annulled, every provision in it was annulled with it. Mr. Justice Holmes said: "If by declaring the assignment an act of bankruptcy the statute means that the conveyance shall not be effectual against the bankruptcy proceedings, as is agreed, the natural and simple construction is that it means that the deed shall be avoided as a whole when the trustee takes the goods. The cases which we have cited and others under insolvent and bankruptcy laws evidently take that view. It follows that the appellants can assert no preference by way of lien under the deed."

The state statutes conferring priorities which have been recognized in bankruptcy by virtue of section 64b(5) so far considered are statutes not affected by the bankruptcy act, save in so far as their effect is concerned when bankruptcy proceedings are instituted. To the same extent have priorities conferred by state statutes, in their nature state insolvency laws, and therefore suspended by the bankruptcy act, been recognized by virtue of said provisions of the bankrupt act.

In the case of In re Wright (D. C.) 95 Fed. 807, it was held that a debt due to Worcester county, Mass., by the bankrupt as the price of convict labor hired by him from its house of correction, was entitled to priority of payment in the distribution of the assets of the bankrupt, because by the insolvency law of that state a debt due to a county was made a preferred claim in insolvency proceedings thereunder. It was urged therein that a state insolvency law was not within the meaning of section 64b(5), because it was suspended by the bankrupt act. In answer to this, Judge Lowell said: "The trustee contends that this section is not now a law of the state of Massachusetts, because as a part of the insolvent law of Massachusetts it has been suspended by the bankrupt law of the United States. The argument is more ingenious than sound. The bankrupt law of the United States does not repeal or altogether avoid the insolvent laws of the several states, but merely suspends their operation so far as they come in conflict with the bankrupt act or intrude upon its province." Again, he said: "An insolvent law may be amended, repealed, or enacted by a state during the existence of the bankrupt law; and such amendment, repeal, and enactment will be valid legislative action, though the operation of these acts in some respects be suspended while the bankrupt law continues in force. When the bankrupt law has been repealed, the insolvent laws of the states become operative; and, if amended during the existence of the bankrupt law, they doubtless become operative in their amended form. Counsel for the trustee sought in argument an analogy between the insolvent laws thus suspended and a law unconstitutional, and therefore void; but the analogy is very imperfect. To establish that the insolvent laws of the several states now upon their statute books are not 'laws of the states,' it must be shown that they are not laws at all; that they are wholly void, and not merely restricted in their application. Inasmuch, therefore, as the bankrupt act of 1898 expressly recognizes the existing validity of these insolvent laws as applied to proceedings commenced before the passage of the bankrupt act, and inasmuch as the insolvent laws revive, ex proprio vigore, on repeal of the bankrupt law, it follows that the insolvent laws have not been made wholly void, but are still laws of the states which adopted them." And, again, he said: "Plainly, the phrase 'laws of the states,' in section 64b(5) of the bankrupt act, was intended to have some meaning; and yet, if the trustee is right in his contention only some exceptional, additional and peculiar statutory priorities were recognized by the bankrupt act, inasmuch as the laws of the states regulating priority are generally a part of the insolvent laws. Even if by passage of the bankrupt act the insolvent laws of Massachusetts were so avoided that it has ceased to be a law of Massachusetts, yet nothing would prevent the Legislature of Massachusetts during the exist-

ence of the bankrupt law from passing a statute establishing priorities. Such a statute would have almost its sole effect in establishing priorities under the bankrupt law of the United States. It would be simply a re-enactment of the rule regarding the distribution of insolvent estates which had prevailed by statute up to the passage of the bankrupt law. To suppose that Congress meant to require such legislation by the states is unreasonable."

The decision of Judge Lowell in this case was affirmed by the Circuit Court of ·Appeals in the case of In re Worcester County, 102 Fed. 808, 42 C. C. A. 637. Judge Putnam said: "We are unable to conceive of any priority to which any one may be entitled by the laws of a state, under section 64 of the bankruptcy act, unless it be a priority created by insolvent laws of that character. It is true that priorities are often created by state statutes relating to the administration of estates of deceased persons,· and also to proceedings for winding up corporations; but such laws are not of that general character which can be supposed to be within the purview of the provision of the bankruptcy act which is concerned here. Of course, statutes touching assignments for the benefit of creditors must be classed with insolvency laws, strictly so called. It is settled that state insolvency laws are not annulled by the enactment of a bankruptcy act, and that the only effect of such enactment is to suspend their operation, so that they become operative again, without re-enactment, when the bankruptcy act is repealed."

In the later case of In re Lewis (D. C.) 99 Fed. 935, Judge Lowell, upon the same ground, gave priority to fees due to a sheriff accruing on a writ of attachment, founded upon a provable debt, issued before the commencement of proceedings in bankruptcy against the debtor, and continued in force at the date of the petition.

In the case of In re Daniels (D. C.) 110 Fed. 745, also, it was held that costs incurred in an action against a bankrupt, prior to the bankruptcy, which would constitute a preferred claim under the insolvency laws of the state, was entitled to preference in the bankruptcy proceedings.

Counsel for the trustee and contesting creditors question the correctness of these decisions so holding that priorities given by a state insolvency law should be regarded in a distribution in bankruptcy by virtue of section 64b(5). They seem to think that this position is inconsistent with the fact that state insolvency laws are suspended by the bankrupt act, as held in the following cases cited by them, to wit: Ex parte Eames, Fed. Cas. No. 4,237; In re Reynolds, Fed. Cas. No. 11,723; Thornhill v. Bank of La., Fed. Cas. No. 13,992; In re Independent Ins. Co., Fed. Cas. No. 7,017; In re Curtis, 1 Am. Bankr. Rep. 440, 91 Fed. 737; Westcott Co. v. Berry, 4 Am. Bankr. Rep. 264, 45 Atl. 352, 69 N. H. 505. The learned judges who decided those cases did not think that there was any such inconsistency, for they expressly recognized the fact that there was such suspension and held as they did notwithstanding this. ·Nor can I see any such inconsistency. To so hold is not to give effect to the state insolvency law. In such case it is the bankrupt act alone that gives effect to the priorities set forth in that law, and this it does, not by setting them forth in so many words therein, but by reference to the state insolvency law. The sole relation of that law to the matter is as to the place where the priorities which the bankrupt act by the clause in question provides for may be found. That clause is simply a short way of providing for them, and in· view of the great number of state jurisdictions and the existence of different priorities in different jurisdictions, it was the only practical way of providing for them. The only possible question that could arise was whether a state insolvency law can be said to be a law of the state upon and after the enactment of the bankrupt act, so as to come within the description of the clause. That it can be said to be so is demonstrated by Judge Lowell in the extracts from his opin· ion in the Wright case quoted above. Nor is the suggestion of Referee Dean, in his opinion in the case of In re Crow, supra, sound. It is in these words: "As an undecided question, it might well be doubted whether it be the intention of Congress by clause 5 of section 64b to give effect to provisions in state insolvency laws when the very object and purpose of the bankruptcy law is to supersede ·state insolvency laws, and the referee would be inclined to hold in the negative." No effect is given to any provision of the state insolvency laws by the position in question. All that has effect is the provision of the

bankrupt act, and in referring to the former for a statement of certain of the priorities which it gives in no way prevents its supersession of those laws.

Judge Putnam, in the Worcester County Case, would seem to limit the reference of the clause in question to state insolvency laws. I cannot go that far. It no doubt includes such laws, but it is not limited thereto. Judges Buffington and Bradford, in the Hoover and Mitchell Cases, gave it a wider scope when they held that statutes providing for prior payment of a certain part of the landlord's rent when the tenant's goods are taken under the execution come within the province of that clause. So do statutes providing for priorities in a distribution under a general assignment for benefit of the creditors, as was held in the Crow Case. Judge Putnam, in the Worcester County Case, classed such statutes "with insolvency laws, strictly so called." If he meant by this that such statutes are state insolvency laws, and suspended by the bankrupt act, his position would seem not to be correct. Loveland on Bankruptcy, p. 29.

In the case of In re Rouse, Hazard & Co., 91 Fed. 96, 33 C. C. A. 356, it was held that the provision of the state insolvency law giving priority to labor claims should not be followed in a distribution in bankruptcy, because the bankrupt act (section 64b[4]) has a specific provision giving priority to such claims. Judge Jenkins said: "Our conclusion is that Congress having spoken specifically to the subject of priority of payment of labor claims, what it has said upon that subject expresses the particular intent of the lawmaking power, and the provision is not to be tolled or enlarged by any general prior or subsequent provisions in that act. That which is given in particular is not affected by general words. So that the statute providing for the priority of payment of debts referred to in clause 5 must be construed to mean other and different debts than those specified in clause 4." In the Wright Case, Judge Lowell thus distinguished the decision in the Rouse, Hazard & Co. Case: "The decision was rested solely upon the ground that the specific provisions of the bankrupt act concerning labor claims were intended to override the provisions relating to wages made by the state statute: that the exemption accorded by the state statute would have been valid in the absence of the express provision of the bankrupt act concerning wages was conceded." The following cases are contra of this case: In re Laird, 109 Fed. 551, 48 C. C. A. 538; In re Slomka (D. C.) 117 Fed. 688.

Coming, then, to the statutory provisions in question, it must be held that they are not state insolvency laws, strictly so called, and were not therefore suspended by the bankrupt act. The happening of certain of the contingencies provided for the attaching of the lien will amount to an act of bankruptcy, and the institution of proceedings in bankruptcy within the proper time will invalidate the legal effect of such happenings. To no other extent does the fact of the bankruptcy have any bearing in relation to those provisions. We have here, then, a case of priority given by state laws which are not state insolvency laws, and which are not suspended by the bankruptcy act. An argument directed against priorities given by such laws being recognized in bankruptcy can therefore have no application here. Unless, then, section 64b(5) is limited to priorities so given, the case in hand comes clearly within its purview.

But it is urged by counsel on behalf of the trustee and contesting creditors that the statutory provisions in question do not confer a priority; they only confer a lien; a lien is not a priority; and therefore said provisions are not within the purview of said clause of the bankrupt act. It is true that there is a distinction between a lien and a priority. In the case of U. S. v. Fisher, 2 Cranch, 358, 2 L. Ed. 304, where the question was whether a certain indebtedness due the United States was within a statute providing priority of payment to the United States in case of insolvency or bankruptcy of its debtor, Mr. Chief Justice Marshall arguendo said: "On this subject it is to be remarked that no lien is created by this law. No bona fide transfer of property in the ordinary course of business is overreached. It is only a priority in payment which, under different modifications, is a regulation in common use: and this priority is limited to a particular state of things when the debtor is living, though it takes effect generally if he be dead."

In the case of Conard v. Atlantic Ins. Co. of N. Y., 1 Pet. 386, 7 L. Ed. 189,

153 F.—44

it was held that an indebtedness due the United States within said statute would not prevail because of its provisions over a specific and perfected lien created by the debtor. Mr. Justice Story said: "What, then, is the nature of the priority thus limited and established in favor of the United States? Is it a right which supersedes and overrides the assignment of the debtor as to any property which the United States may afterwards elect to take in execution, so as to prevent such property from passing by virtue of such assignment to the assignee? Or is it a mere right of prior payment out of the general funds of the debtor in the hands of the assignee? We are of the opinion that it clearly falls within the latter description." Again, he said: "If, then, the property of the debtor passes to the assignees, if debts due to the United States constitute no lien on such property, if the preference or privilege of the United States be no more than a priority of satisfaction or payment out of the common fund, it would seem to follow as a necessary consequence that, even if the teas in controversy were the property of Edward Thompson, they passed by his general assignment in November, 1825 (which is not denied to have been a bona fide and valid transaction), to his assignees and became their property for distribution amongst his creditors and were not liable to the levy' under the execution of the United States." And, again, in distinguishing the case of Thelusson v. Smith, 2 Wheat. 396, 4 L. Ed. 271, he said: "It is obvious that it established no such proposition as that a specific and perfected lien can be displaced by the mere priority of the United States, and that priority is not itself equivalent to a lien."

But the distinction between the two is that a mere priority is not a lien, and not that a lien is not a priority. A lien is a priority. It is that, and something more. That something more is that it is a hold on the property covered by it that fixes the priority so that it cannot be affected by subsequent events. No other distinction was drawn in the cases cited than this. Whilst, then, the statutory provisions in question do not confer a mere priority on the employé and materialman, they do secure him a priority through the lien which they confer. And though the right conferred is termed a "lien" in all instances, there is room for saying that in certain of them it is nothing more than a mere priority or is without greater value than a mere priority. Those instances are when it attaches because the property and effects of the company, owner, or operator are put in process of distribution amongst its creditors in one of the modes specified or referred to generally in section 2487. If the statute had simply provided that in such cases the employés and materialmen should be first paid, the right conferred would have been really in no wise different in its character from and equally as valuable as the lien which it does confer. It is only when the lien attaches, upon the happening of one of the contingencies specified in section 2490 that the right conferred takes on really the character and value of a lien. The difference between the rights conferred in the two cases is recognized by sections 2490 and 2491, in that they provide that in the latter case the lien may be enforced by proceedings in equity, and in the former case all that is necessary to do is to file the claims for which the lien is asserted with the person authorized to receive and report claims. Section 2491 is confused, in that it seems to provide that in the former case an independent suit may be brought to enforce the lien. It certainly does not require a suit in such case as is essential in the other case.

It is upon this line of reasoning that I reach the conclusion that the claimants are entitled to the preference claimed, notwithstanding the fact, which I have conceded, that none of the statutory contingencies has happened, and their inchoate right has not become perfect. Either ground stated is sufficient in and of itself to establish the right to the preference claimed. Under the act of 1867, claimants would have been entitled thereto; but the basis of their right would have been limited to the first ground stated, as in that act there was no provision recognizing priorities conferred by the state laws.

The decision of Judge Evans, in the case of In re Falls City Shirt Mfg. Co. (D. C.) 98 Fed. 592, which involved the statutory provisions involved here, may be said to be authority in support of the conclusion here reached. It really assumes, without discussion, that the lien or priority conferred by those provisions can be asserted in bankruptcy, though apart from the proceedings therein none of the contingencies provided for has happened prior

thereto. The right to so assert it, however, is put upon a basis different from that on which I have placed it. The proceedings in bankruptcy and the coming of the property and effects of the bankrupt into the hands of the trustee in bankruptcy for distribution amongst creditors is treated as the happening of a contingency provided for in section 2487, and it is considered that thereupon the inchoate lien or right attaches and becomes perfect. One question involved and determined therein was as to the priority between the bankrupt's landlord and a materialman. On the idea that said statutory provisions were the only pertinent considerations, it was held that by virtue of section 2488 the former had the prior right. The time of the attaching of the materialman's lien, and not of the creation of his debt, was treated as the time to be compared with that of the creation of the landlord's debt lien. Basing the materialman's right on the grounds put forth herein would probably not bring about a result different from that reached therein. The other question considered and determined therein was as to when it is essential for the materialman to assert his lien in the bankruptcy proceeding in order to preserve it.

In the discussion thus far, I have put to one side certain decisions cited and relied on by counsel for claimants, because I do not deem them relevant to the question in hand. Those decisions are the following, to wit: In re Kerby Denis Co. (D. C.) 94 Fed. 819; Id., 95 Fed. 116, 36 C. C. A. 677; In re Emslie, 102 Fed. 294, 42 C. C. A. 350; In re Laird, 109 Fed. 550, 48 C. C. A. 538. These decisions are not relevant to the question in hand, because they all involved liens which were perfect when the bankruptcy proceeding was instituted. In the Kerby Denis Co. Case the lien was one under a Wisconsin statute creating a lien in favor of employés performing certain kinds of labor, and providing that such lien should not continue in force, unless a statement thereof is filed within 30 days, and an action is begun within 3 months. The lien was created by the statute, and not by the acts of filing and bringing suit which merely preserve or keep it in force. Certain of the claimants had prior to the institution of the bankruptcy proceedings filed statements and brought suits within the prescribed time, and certain others had not done so. It was held that the former were entitled to preference, and the latter were not. In the Emslie Case the lien involved was one under the mechanic's lien law of New York, the peculiarity of whose law is in providing that the lien shall not attach until the filing of the notice. There the notice had been filed within the prescribed time prior to the institution of the bankruptcy proceeding. It was held that the notice was defective, and therefore claimant was not entitled to the preference, but that if it had not been defective he would have been entitled thereto. In the Laird Case the lien involved was one under an Ohio statute providing that, in all cases where the property of an employer is placed in the hands of an assignee, receiver, or trustee, claims due for labor performed within the period of three months prior to the time such assignee, receiver, or trustee is appointed shall be first paid out of the trust fund in preference to all other claims against such employer, except claims for taxes and costs of administering the trust. In that case the property of the bankrupt had been placed in the hands of a receiver prior to the institution of the bankruptcy proceedings. It was held that the nature of the right of a laborer under this statute was a lien, and that the laborer claimants therein were entitled to preference. These cases involved problems of their own. One was as to the basis on which such perfected liens are entitled to preference in bankruptcy; and another was as to whether such liens were affected by the provisions of sections 67e and 67f of the bankrupt act annulling liens and incumbrances. It was held that they were not affected thereby. They did not involve any of the problems with which we have to do here, and hence it is that I have treated them as not relevant to any of the questions herein involved.

2. Another ground upon which it is urged on behalf of the trustee and contesting creditors that claimants are not entitled to preference is that their rights are affected by said provisions of the bankrupt act just referred to, to wit sections 67e and 67f. This position is really inconsistent with the foregoing one. Said provisions invalidate certain liens and incumbrances. The position that they affect claimants' rights herein presupposes that they

have liens to be affected; whereas, the former position is based upon the supposition that claimants do not have any liens, as none of the contingencies upon the happening of which liens are to attach have happened in this case. This supposition I have conceded to be correct, and being so it necessarily follows that the claimants' rights are in no wise affected by said provisions of the bankrupt act. If the liens in the Kerby Denis Co., Emslie, and Laird Cases, as held therein, were not affected by said provisions, it is hard to make out that claimants' rights, which were not liens at all, were affected thereby.

3. A third ground upon which it is so urged is that claimants, to preserve their rights, should have filed in the clerk's office of the county in which the materials were furnished a certain verified statement in writing within 60 days after the last day of the last month in which the materials were furnished, and they failed so to do. It is maintained that the state statute required the filing of such statement within such time. Of course, if the state statute so required, the failure to comply with it is fatal to claimants' rights. No such requirement is found in any of the statutory provisions heretofore considered. If it exists at all, it is to be found in section 2494, one of the succeeding sections in the same article as those provisions. Said section is in these words: "No lien provided for in this article shall attach unless the person who performs or furnishes the labor or teams shall, within sixty days after the last day of the last month in which any labor was performed or materials or team were furnished file in the county clerk's office of each county in which the labor was performed or materials or teams were furnished a statement in writing, verified by affidavit setting forth the amount due therefor, and for which the lien is claimed, and the name of the canal, railroad, turnpike or other public improvement upon which it is claimed. Said claim shall be filed and indorsed by the clerk of the court giving the date of the filing. The clerk shall also make an abstract and entry thereof as now provided by law in case of mechanics' liens, and in the same book used for that purpose, and shall make proper index thereof. For his services the clerk shall be paid one dollar by the party filing the claim, which may be recovered by him as costs from the party against whom the claim is filed."

In order to determine the applicability of this section to the case in hand it is essential to understand the two preceding sections, to wit, sections 2492 and 2493, which intervene between it and those heretofore considered and the immediately succeeding section, to wit, section 2495, all of which are in the same article. It will be helpful also to note the provisions of the concluding sections of the article, to wit, sections 2496, 2497, 2498, 2499, so that in viewing the question now under consideration we may be, as it were, on top of the entire article.

By section 2492 it is provided that all persons who perform or furnish labor, material, supplies, or teams for the construction or improvement of any canal, railroad, turnpike, or other public improvement in this commonwealth by contract, expressed or implied, with the owner or owners thereof, or by subcontract thereunder, shall have a lien thereon and upon all of the property and franchise of the owner or owners thereof for the full contract price of such labor, material, supplies, and teams so furnished or performed, which said lien shall be prior and superior to all other liens thereafter created thereon. It is further provided therein that any person undertaking or expecting to perform or furnish labor, material, supplies, or teams may acquire a lien therefor by filing in the clerk's office of each county wherein he shall have so undertaken to perform or furnish labor, material, supplies, or teams, a statement in writing stating that he has so undertaken and expects to perform or furnish labor, material, supplies, or teams, and the price at which the same is to be furnished, and the lien for labor performed, materials, supplies, or teams furnished thereafter shall relate back and take effect from the filing of such statement. It was still further provided therein that as to all original construction such lien shall be prior to all liens theretofore or thereafter created on the part so constructed and no other part. The section as it stood originally contained neither of the last two provisions stated. They were added by an amendment of date March 21, 1896. It will be noted that the lien thus provided for is like the lien provided for in section 2487 and the

succeeding sections relating thereto, in that it relates to a canal, railroad, turnpike, or other public improvement, but differs therefrom, in that it does not also relate to a mine, rolling mill, foundry, or other manufacturing establishment; that the lien is not contingent on the happening of certain events, but attaches at once on the performance of the labor or furnishing of the materials, supplies, or teams; that it applies to subcontractors as well as contractors, and supplies and teams as well as labor and materials; that it covers all the property of the debtor, instead of being limited to the property and effects involved in the business, and all the accessories connected therewith; and that as amended, upon due compliance with the provisions of the amendment, it does not simply attach at the time of the performance of the labor or furnishing of the material, supplies, or teams, but relates back to the time of the undertaking so to do, and takes precedence not only of all liens thereafter created, but in case of original construction in every instance of all liens theretofore created on the part so constructed. This recital of the difference between the two liens is sufficient to indicate that these differences are quite marked and distinct.

By section 2493 it is provided that the liens provided for "in the foregoing section" should in no case be for a greater amount in the aggregate than the contract price of the original contractor, and should the aggregate amount of liens exceed the price agreed upon between the original contractor and the owner or owners of the canal, railroad, turnpike, or other improvement, then there should be a pro rata distribution of the original price among said lienholders.

Section 2495 is in these words: "Liens acquired under this article shall be enforced by proper proceedings in equity, to which other lien-holders must be made parties, but such proceedings must be begun within one year from the filing of the claims in the county clerk's office as herein provided."

Then, as to the concluding sections of the article, to wit, sections 2496 to 2499, inclusive: By section 2496 it is provided that in a written contract for the sale of railroad equipment or rolling stock, deliverable immediately or subsequently at stipulated periods by the terms of which the purchase money in whole or in part is to be paid in the future, it may be agreed that the title to the property sold or contracted to be sold shall not pass to or vest in the vendee until the purchase money shall have been fully paid, or that the vendor shall have and retain a lien thereon for the unpaid purchase money, notwithstanding delivery thereof to the vendee; but the terms of credit should not exceed 25 years. It was further provided therein that such agreement should not be valid as against subsequent purchasers for value without notice or against creditors until acknowledged or proved, as deeds of trust and mortgages are required to be, and lodged for record in the office of the Secretary of State, where they should be recorded. By section 2497 provision is made for a conditional sale of such property in a contract of leasing and renting, the rentals as paid to be treated as purchase money and the title not to vest in the lessee, notwithstanding the delivery of the property to him, until the purchase money is paid in full, "subject, however, to the provisions contained in section 2495." By section 2498 provision is made for the release of the lien provided for in section 2496 and assignment of the obligations secured thereby. Section 2499 is in these words: "On each locomotive or car that may be sold or leased in accordance with the provisions of this article, the name of the vendor or lessor shall be distinctly marked, followed by the word 'owner' or 'lessor' as the case may be."

Sections 2487 to 2491, inclusive, are not original legislation. They are re-enactments of former legislation. They were originally enacted substantially as they are contained in said article by the act of March 20, 1876 (1 Sess. Acts 1875-76, p. 115, c. 902). The only differences are that said act only related to railroad companies and the owners or operators of rolling mill, foundry, or other manufacturing establishment; that it contained a section giving a like lien to all persons whose property should have been injured by the carelessness of a railroad company or its employés for the damages sustained; and that it provided for an independent suit for the enforcement of the lien in case the lien attached because of the happening of one of the contingencies which are set forth in section 2490 of Kentucky Statutes of 1903. It con-

tained no provision for the bringing of such a suit in case the lien attached because of the happening of any of the contingencies set forth in section 2487. It evidently contemplated that in such case no suit was needed, as the happening of any said contingencies put the property and effects covered by the lien in process of distribution amongst creditors, and all that was needed was for the claimant to assert his lien before the person or court having charge of the distribution by filing his claim with him or it, and no limit was provided in which he should do this. The limit as to time of assertion of the lien had relation solely to where it was necessary to assert it by an independent suit. By an act of March 4, 1880 (1 Sess. Acts 1879–80, p. 165, c. 1382), the foregoing act was amended by cutting the right of the materialman to any lien for materials or supplies furnished to any rolling mill foundry, or other manufacturing establishment, and the lien of laboring men in rolling mills, foundries, or other manufacturing establishments for wages down to wages due within 60 days before any assignment for any purpose as specified in the original act. The law in this particular thus remained until February 25, 1893.

Likewise, sections 2492 to 2495, inclusive, are not original legislation. They, too, are re-enactments of former legislation. They were originally enacted substantially as they are contained in said article save as section 2492 embodies the amendment of March 21, 1896, by the act of March, 1888 (1 Sess. Acts 1887–88, p. 99, c. 1271). Likewise sections 2496 to 2499, inclusive, are not original legislation. They, too are a re-enactment of former legislation. They were originally enacted substantially as they are contained in said article by the act of March 17, 1882 (1 Sess. Acts 1881–82, p. 43, c. 454). On the 25th day of February, 1893, the act entitled "As concerning liens" (Sess. Acts 1891–92–93, p. 505, c. 151), became a law. Article 3 of that act was made up of a combination of said three several acts. The act of March 21, 1876, was re-enacted substantially as it was originally, save that it was enlarged to take in a turnpike, canal, and other public improvement; the amendment of March 4, 1880, being abandoned. The acts of March, 1888, and March 17, 1882, were substantially re-enacted. The third article of this act of February 25, 1893, was thus made up of these three distinct and separate strata of legislation. The phraseology of the old legislation was but slightly changed in the re-enactment, and this act of February 25, 1893, constitutes chapter 79 of Kentucky Statutes of 1903, save as it embodies the amendments of March 21, 1896. Sections 25 to 29, inclusive, of the third article of that act, substantially the act of March 21, 1876, constitute sections 2487 to 2491 inclusive, of the third article of said chapter; sections 30 to 33 inclusive of the third article of that act, substantially the act of March, 1888, constitute sections 2492 to 2495, inclusive, of the third article of said chapter; and sections 34 to 37 inclusive, of the third article of that act, substantially the act of March 17, 1882, constitute sections 2496 to 2499, inclusive, of the third article of said chapter.

With this general survey of the sections of article 3 of chapter 79 of the Kentucky Statutes of 1903, and their history we are in position to approach the question now under consideration. That question is the contention of counsel on behalf of the trustee and contesting creditors that section 2494 has application to a lien asserted under sections 2487 to 2491, inclusive, and that by reason of claimant's failure to comply with said section they are not entitled to the preference claimed. The sole basis of the contention is that in section 2494 it is said that "no lien provided for in this article" shall attach unless a statement is filed as provided therein. The lien provided for by sections 2487 to 2491 is one provided for by said article. Hence it is urged that by the very terms of section 2494 its provisions apply to such lien. But to confine one's self to these words is to stick in the bark. The thing to be determined is the intent of the Legislature, and to determine this the whole article and the history of the legislation it embodies is to be looked at. Prior to the act of February 25, 1893, as the legislation embodied in the first group of sections, to wit, sections 2487 to 2491, inclusive, stood, there was no requirement that a statement be filed in the county clerk's office to preserve the lien provided by it. If that act and the Kentucky Statutes contain such a requirement in section 32 of the one and 2494 of the other it is an innovation.

Never before in the history of this particular legislation was any such requirement made.

Again, the 13 sections constituting article 3 of chapter 79 of Kentucky Statutes of 1903 fall into three separate and distinct groups in accordance with the legislation as it stood prior thereto. Sections 2487 to 2491, inclusive, constitute the first group and represent the act of March 21, 1876. Sections 2494 to 2495, inclusive, constitute the second group and represent the act of March, 1888. And sections 2496 to 2499 constitute the third group and represent the act of March 17, 1882. The first section of each group is the leading section thereof; 2487 of the first group, 2493 of the second, and 2496 of the third. The other sections of the first group relate to its leading section, and likewise the other sections of the third group relate to its leading section. None of the subordinate sections of the third group relate to sections of the other two groups; nor does any of the subordinate sections of the third group relate to any section of the other two groups. Apparently this is not so. In section 2497 occur the words "subject, however, to the provisos contained in section 2495," which we have quoted above. In the act of February, 1893, the words are "subject, however, to the provisos contained in section 33." But evidently this is a pure mistake. The reference in the one instance is to section 2496, and in the other to section 34, the leading section of the third group. In the act of March 17, 1882, the original legislation, the words are "subject, however, to the provisions contained in section one of this act." Section 1 of that act is section 34 of the act of February 25, 1893, or section 2496 of Kentucky Statutes of 1903, the leading section of the third group. If, then, section 2494, a subordinate section of the second group, relates to any other section of the third article than its own leading section, it does that which none of the other subordinate sections of the other two groups does. It breaks the symmetry of the arrangement.

Again, the only reason for holding that section 2494 does relate to any other section than the leading section of its own group is because of the phraseology "no lien provided for in this article"; but that phraseology requires one to relate the section to the lien provided for in the leading section of the third group, as well as to the lien provided for in the first group. Yet one would hardly contend that it has any relation to the former lien.

Again, similar phraseology in other sections of the article do not have and cannot be given any such wide effect. In that portion of section 2491 which contains the limitation as to time in which suit is to be brought or claims filed, we have these words: "Suit must be filed to enforce the lien given by this article within sixty days from the date of the assignment or from the date when the property shall go into the hands of a receiver or trustee or from the date when the business shall be stopped or suspended or the property sold, or the claims for which a lien is asserted must be filed in said time with the person authorized to receive and report claims." Of course, "the lien given by this article" is more definite than "no lien provided for in this article"; but those words indicate that the draftsman at the time was thinking of the article as providing for a single lien, and that the lien provided for in section 2487. That he was still thinking of the article as providing a single lien, and that the lien provided for in section 2492, would account for his using the words "no lien provided for in this article," when no reference was intended to be had to any other lien than that provided for in section 2492. It is also true that the words used in section 2491 in describing the event from which the 60 days is to be counted show that reference is had to the lien provided for in section 2487, and not to either of the other two liens provided for in said article. But, as we shall see, there are other words used in section 2494 which show that reference is had to the lien provided for in section 2492, and in none other.

Then, in section 2495, we have these words: "Liens acquired under this article shall be enforced by proper proceedings in equity, to which the other lienholders must be made parties, but such proceedings must be begun within one year from the filing of the claim in the county clerk's office, as herein provided." Now, whilst the language here used is general, "liens acquired under this article," it is certain that reference is had solely to liens acquired under section 2492, the leading section of the group to which section 2495 be-

longs as a subordinate section. It can have no reference to liens under section 2487. All the liens provided for thereby do not have to be enforced by proper proceedings in equity. It is only when the liens attach because of the happening of the contingencies set forth in section 2490 that they have to be so enforced. When they attach because of the contingencies set forth in section 2487, all that is necessary to do is to file the claims with the person authorized to receive and report claims, as provided in section 2491. Said language can have no reference to liens under section 2487, for the additional reason that the limitation prescribed in section 2495 can have no reference thereto. This because section 2491 prescribes the limitations applicable to liens under section 2487; and, further, inasmuch as liens under section 2487 do not attach at all before the happening of one of the contingencies set forth in sections 2487 and 2490, it could not have been intended to provide that proceedings to enforce them should be brought before they came into existence.

Then, in section 2499, we have these words: "On each locomotive or car that may be sold or leased in accordance with the provisions of this article, the name of the vendor or lessor shall be distinctly marked, followed by the word 'owner' or 'lessor' as the case may be." Here the words "in accordance with the provisions of this article" can have reference solely to sections 2496 and 2497 of the group to which section 2499 belongs, and yet this broad language is used as if it might have reference to provisions in the other groups.

There are, then, four instances in the article where the word "article" is used. In three of them it has reference to the group of sections in which it occurs, and to no other group. Is it not reasonable to conclude that in the other or fourth instance it has no wider scope? Where the word "article" occurs in sections 2494 and 2495 it is in substitution for the word "act" in the act of March, 1888. Of course, there it has sole reference to the lien provided for in section 2492. So where the word "article" occurs in section 2499 it is a substitution for the word "act" in the act of March 17, 1882. The phraseology in section 2491, where the word "article" occurs, is new, and hence it is not used in substitution for anything in the original legislation.

Again, as heretofore indicated, other phraseology in section 2494 shows that the requirement of that section, notwithstanding that relied on, has reference solely to the lien provided for in section 2492, and can have no relation to that provided for in section 2487. It is that used in providing what the statement required to be filed shall contain. Amongst other things, it is provided that it shall contain "the name of the canal, railroad, turnpike or other public improvement upon which it [the lien] is claimed." The lien provided for in section 2492 is limited to persons who perform labor or furnish materials, supplies, or teams for the construction or improvement "of any canal, railroad, turnpike, or other public improvement in this commonwealth"; whereas, the lien provided for in section 2487 takes in also persons who perform labor for or furnish material to any mine or owner or operator of any rolling mill, foundry, or other manufacturing establishment. The provision of section 2494 in regard to the statement to be filed does not contemplate that said section has any application to a mine, rolling mill, foundry, or other manufacturing establishment.

And, finally, the provisions of section 2494 in regard to the filing of a statement would not seem to be germane to the lien provided for in section 2487. We must bear in mind the position taken at the outset as to the character of lien provided for in that section. It is a contingent lien, and the contingency in each instance is one over whose happening the employé or materialman has no control whatever. The happening thereof depends upon the action of the debtor or of his creditors. No other action brings it into existence. It is something that he or they do that has this effect. Now the rule, at least in statutes as to mechanics' liens and liens of a similar character where provision is made for the filing of a notice or statement, is for the lien to come into existence upon the creation of the debt, or, at the farthest, as in New York, upon the filing of the notice or statement; the failure to file same, when the lien comes into existence at the creation of the debt, forfeiting the lien. In the one instance, the filing of the notice or statement preserves the lien; in the other, creates it. It is the creation of the debt or the filing of the notice or statement by the employé or materialman which calls the lien into

existence, and invariably a provision as to filing a notice or statement in such cases is followed by a provision as to bringing suit within a certain short period of time to enforce the lien. Here, if section 2494 has application to the lien provided for in section 2487, it neither preserves nor creates the lien. It is simply a limitation upon the effect of the happening of the contingencies, and this when section 2487 contains no intimation of a limitation therein, and it has a different bearing on the lien provided for in section 2492 from what it has on that provided for in section 2487. In the former section it preserves the lien which comes into existence with the creation of the debt. Nor is there any provision as to bringing suit within a certain short period of time after the filing of the notice or statement when the lien arises under section 2487.

The limit prescribed by section 2495 has reference solely to when it arises under section 2492. Under section 2487 the lien may attach at any period of time after the creation of the debt short of the time when the debt is barred by the statute of limitation. Why prescribe that the notice or statement be filed within the short period of 60 days after the last day of the last month in which labor was performed or materials furnished, and yet allow the lien to be asserted within 5 years, and even within 15 years if a note is taken, after the debt is due? Of what value is the notice after the lapse of any great period of time? Is it of any more value than the statute and the nature of the business being carried on? If there is any severity of hardship in the lien provided for in section 2487, it is in its character, and not in the absence of a provision as to filing a notice or statement. It is said that the lien provided for in section 2487 is an anomaly, in that no other state has a similar statute. If so, and such would seem to be the case, no argument can be drawn from the uniform requirement of filing notice or statement in ordinary mechanic's lien statutes that it was intended to require such filing here, particularly when there is no requirement as to bringing suit within a period of time after the filing, which is also a uniform requirement in such statutes. The requirement as to filing a notice or statement seems out of place as to a lien of this anomalous character.

It is true, as suggested, that an examination of chapter 79 shows that the framers thereof knew the distinction between the meaning of the words "section" and "article," for they at times use the one word and at other times the other word. As, for instance, in the first article section 2468 says, "the liens mentioned in the preceding section," and section 2477 says, "the liens declared in this article," and in the second article section 2482 says, "the lien given in section 2480 and the liability mentioned in section 2481 of this article," and section 2485 says, "all persons having liens under this article," and section 2486, "the lien given by this article." But it is to be noted that the first article relates to but one kind of liens, to wit, the ordinary mechanic and materialmen's liens, and that the second article relates to but one kind of liens, to wit, watercraft liens. Neither article relates to more than one kind of liens, as does the third article, which relates, as shown, to three distinct kinds of liens. Where, then, in the first and second articles, the words "liens declared in this article" or "liens under this article" are used, they have reference and can have reference, to but one kind of liens; and where in the third article the words "lien given by this article" are used in section 2491, belonging to the first group of sections, the words "in accordance with the provisions of this article" are used in section 2499, belonging to the third group of sections, and the words "lien acquired under this article" are used in section 2495, belonging to the second group of sections, reference is had, and can be had, to but one kind of liens, to wit, the kind to which the group in which the words occur belong. And yet it is contended that the words "no lien provided for in this article," in section 2494, belonging to the second group of sections, have a wider significance than substantially the same words in the first and second articles in the first and third groups of the third article and in the second group thereof, the same group in which they occur, have; and in giving them the wider significance, all the liens in the article are not taken in, but they are limited to the liens covered by the first group, leaving out those covered by the third. Limiting the words in question to liens of a single kind and those covered by the second group of sections in which they

occur is but giving them the same significance that is given to substantially the same words wherever they occur throughout the chapter.

It is true also, as suggested, that in section 2493 the words used are "the liens provided for in the foregoing section"; whereas, in section 2494 the words used are "no lien provided for in this article." This is accounted for by the fact that section 2493 contains the same words as are contained in the original act of March, 1888. Where the latter words occur therein, are these words, "no lien provided for in this act." In making the revision or re-enactment some substitute for the word "act" had to be found, and the word "article" was used without intending to give the words any wider scope in the revision and re-enactment than that they had in the original act. If at the time the framers were thinking of the article as containing but one kind of liens, to wit, that covered by the second group of sections, the word "article" was the proper word to use in the substitution for the word "act." Of course, this view of the matter attributes to the framers thoughtlessness or carelessness. But it is conceded that in framing section 2494 they were thoughtless or careless. The only question is where the thoughtlessness or carelessness comes in. Counsel for the trustee and the contesting creditors would fix it in that portion thereof relating to the character of the statement to be filed and exclude it from the words in question. Not a single consideration occurs to me for so locating it. The numerous considerations heretofore set forth combine to locate it in the words in question. No greater significance can be given to section 2494 than if it had read "no lien shall attach," etc., leaving out the words "provided in this article."

In that case there would be no room for claiming that the section had relation to any other liens than those covered by section 2492. The words "provided for in this article," etc., therefore, are mere surplusage and without legal signification. I conclude, therefore, that this ground is not well taken.

4. A fourth ground upon which it is urged that one of the claimants is not entitled to a preference as to a portion of its claim is that it accepted personal security therefor, and thereby waived its right to a lien under the statute. The material furnished by the claimant Hiram Blow & Co. was furnished on 18 different dates between and including January 1, 1905, and February 9, 1905. The whole amount furnished came to $12,219.59, upon which $348.93 has been paid, leaving a balance due of $11,870.66. Between and including April 26, 1905, and July 19, 1905, the bankrupt on account of this indebtedness executed to said claimant 10 separate notes in different amounts, payable at Richmond National Bank, Richmond, Ky., from 30 to 60 days after date, upon all of which, except two, certain Humes connected with and interested in the bankrupt were sureties. The notes were all negotiated to certain banks, and upon nonpayment at maturity were taken up by the claimant. The contention is that the claimant Hiram Blow & Co., by taking these notes with sureties subsequent to the furnishing of the material and creation of the indebtedness therefor and the acquisition of the right to the contingent lien, waived its right thereto. In support of this contention, 19 Am. & Eng. Enc. of Law, p. 30, and Jones on Liens, vol. 2, § 1519, are cited. The statement as to the law on the subject by the former is in these words: "The prevailing doctrine as to vendors and mechanics' liens seems to be that the taking of the note of a third person or the debtor's note or bond with surety or negotiable note drawn by a third person and indorsed by the debtor is presumptively a waiver of the lien. This presumption may, however, be rebutted by parol evidence that it was not the intention of the parties that the lien should be divested." The statement by the latter is in these words: "A lien is waived by taking collateral security for the debt which by operation of the statute might be secured by the lien. This is upon the idea that the taking of full security is inconsistent with the idea of there being a mechanic's lien upon the land for the same debt, or, in other words, the taking of such security shows an intention to waive the security afforded by the statutory lien. It is immaterial what such security be, if it only be distinct security. It may be a mortgage on the same or other property; or a pledge or obligation of a third person; or a chattel mortgage, a guaranty, or an indorsed note." A further statement of Jones on Liens, vol. 2, § 152, is relied on by counsel for claimant. It is in these words: "That there are authorities which hold that

the taking of security does not of itself show an intention to waive a mechanic's lien, and that it is not waived unless the security is inconsistent with the lien. In conformity with this view, the taking of security in the form of promissory notes of third persons has been held not to discharge the lien unless the notes are expressly received in payment, and the burden of proof is upon the debtor to show by direct and positive proof that the creditor agreed so to receive them."

The point at issue seems to be whether the taking of other security for the indebtedness is presumptive evidence of a waiver of the lien or right thereto. It is not claimed that in and of itself it amounts to a waiver. According to one line of authorities, it is presumptive evidence thereof, and the burden is on the mechanic or materialman to show by relevant evidence that it was not in fact waived; and, according to the other, it is not such evidence, and the burden is on the debtor to show that in fact it was waived. I do not deem it essential to carefully examine the relevant decisions and determine on which side of the question is the weight of authority. I have an idea that such an examination thereof will disclose that the weight of authority is in favor of the position that the acceptance of personal security for his indebtedness by a mechanic or materialman is not presumptive evidence of a waiver of his lien or right thereto. In determining this question, cases involving mortgages or liens accepted by mechanic or materialman on the same or other property should be put to one side. These cases involve an element not present in cases involving personal security, merely, and that element is estopped. Howe v. Kindred, 42 Minn. 433, 44 N. W. 311. Judge Collins said: "The reason usually given in the adjudicated cases for holding that a mechanic or materialman has lost his lien by taking security either upon the property to which the lien attaches or upon other property is that subsequent lienholders and purchasers have the right to rely upon the record and should be protected against secret liens."

Possibly, also, cases involving vendors' liens should be put to one side. The vendor's lien is a creature of equity, and the same rule may not be applicable to a mechanic or materialman's lien, which is a creature of statute, as is applicable to the former. The reason why I do not deem it essential to make such examination or determination is that I think that it must be held that in Kentucky the rule is that acceptance of personal security by a mechanic or materialman is not presumptive evidence of a waiver of his lien or right thereto.

In the case of Smith v. Well's Adm'x, 4 Bush (Ky.) 92, it was held that a landlord does not waive his exclusive lien for rent upon the tenant's property, which is a creature of statute, by taking personal security for the rent. Judge Hardin said: "The second ground on which a reversal is sought involves the inquiry whether Middleton did or not, in taking personal security for the rent, waive his lien on the tenant's property; and, if he did not so waive his lien, whether the appellant, in consequence of his suretyship as the assignee of Middleton, had a claim on the property of W. W. Smith which should have been preferred to that acquired by the levy of the appellant's execution. By the provisions of the Revised Statutes of 1852 in relation to landlord and tenants, as amended in 1858 (2 Stanton, p. 99) it is provided that a landlord shall have an exclusive lien on the produce of the farm or premises rented, on the fixtures, on the household furniture, and other personal property of the tenant or under tenant, found upon the rented premises, after possession is taken under the lease. Although it has been held under particular circumstances that a vendor may waive his lien for the purchase money by the acceptance of other security, the principle of such decisions is not, we think applicable to this case. There is nothing in the acceptance of personal security inconsistent with the lien conferred by the statute in a case like this, where there is no evidence of an intention to treat the original claim as discharged by the acceptance of any mere obligation or the creation of a new debt; and it seems to us that a lien existed for the rent, although other security was taken."

Of course, if such is the law as to the landlord's statutory lien, it is also the law as to the mechanic or materialman's statutory lien, and evidence that such is the law in the latter case may be found in the statute itself. A statute

creating the ordinary mechanic and materialman's lien was passed in this state as early as ———, and remained a law on the subject until said act of February 25, 1893 (Laws 1893, p. 505, c. 151), entitled "An act concerning liens," became a law, when it was substantially re-enacted as article 1 of that act. It contained an express provision that the liens created thereby should not have effect if security should be taken for the labor performed or materials furnished. As the provision stood in chapter 70 of the General Statutes of Kentucky, it was in these words: "Nor shall the liens authorized by this chapter have effect if security shall have been taken for the labor performed or material furnished." That chapter had relation solely to the ordinary mechanic or materialman's lien. It did not include the liens covered by the acts of March 21, 1876, March 17, 1882, and March, 1888, hereinbefore referred to. The provision as to the effect of taking security being limited to liens authorized by said chapter 70, it had no relation to the liens covered by said other acts. The effect of taking security upon the liens covered thereby was left open to be determined by the principles of the common law. The act of February 25, 1893, entitled, "An act concerning liens," combined all of said liens into one act; article 1 thereof covering the ordinary mechanic and materialman's liens, and article 3 covering said other three kinds of liens created by said several acts as hereinbefore set forth. It also combined therewith what are called watercraft liens covered by article 2, livery stable keepers' and registers' liens covered by article 4, and keeper of jacks, stallions, and bulls' liens covered by article 5. The language of the former chapter 70 of the General Statutes in regard to the effect of taking security was carried forward into article 1 of said act of February 25, 1893, exactly as it stood there, so that the liens to be affected by the taking of security was still as it had been, "liens authorized by this chapter." There it could only have relation to the ordinary mechanic and materialman's liens, because they were all the liens covered by chapter 70 of the General Statutes. The act of February 25, 1893, was not a chapter. It was merely an act. When it became incorporated in the Kentucky Statutes as a part thereof, it became a chapter, to wit, chapter 79. The act and chapter being a combination and re-enactment of a number of older acts substantially as they stood formerly, it is questionable whether it was intended that the provision as to the effect of taking personal security should have a wider scope than it had theretofore had. I have reached the conclusion that the word "article," where it is used in article 3 in substitution for the word "act" in the former acts, was not intended to give the provision where it occurs wider scope than it formerly had. It is assumed by counsel on both sides herein that said provision as to the effect of taking security had application to liens under article 3. I do not find it necessary to determine this matter. Possibly it did have such application; but, whether so or not, it has had no application since the amendment of March 21, 1896, for by said amendment said provision was repealed, and there has been since then no such statute as to any of the liens covered by chapter 79 of Kentucky Statutes.

The evidence then in the statute itself to which allusion has been made of the fact that in Kentucky the taking of personal security is not a presumptive evidence of a waiver of the mechanic or materialman's statutory lien is the provision referred to as to the effect of taking such security. It would hardly have been enacted if it had not been the law that otherwise the taking of security was not presumptive evidence of such a waiver: but, however this may be, it must be accepted that the repeal of the provision is evidence of legislative intent that the liens created by the statute should no longer be affected by the taking of security. This is not the case of a repeal of a statute covering a certain subject in toto. It is simply a repeal of a particular provision in a statute covering a certain subject. The statute as it stood with that provision enacted that the liens covered by it should be affected by the taking of security. Its repeal was as much as to say that it should not be so affected.

It is urged on behalf of claimants that, assuming that its taking personal security is presumptive evidence of waiver, and the burden is on it to show that it was not intended to waive the lien thereby, it has rebutted that presumption and shown that there was no such intention. The evidence consists of the affidavits of one of the partners in Hiram Blow & Co. and its general

manager to the effect that there was no intention on the part of said claimant to waive its lien and that the personal security was taken as additional security. I doubt whether this is sufficient evidence of intention in case the taking of personal security is presumptive evidence of waiver, or the burden is on claimant to show that it was not intended to waive the lien. I am inclined to think that in such a case some facts must be shown from which it would be legitimate to infer that there was no such intention. But for the reasons heretofore stated I conclude that this ground is not well taken.

5. A fifth and final ground upon which the trustee and contesting creditors base the contention which they have put forward is that the claimant holds as assignee the claims which it has asserted. As to the claim referred to for a balance of $11,870.66, the claimant was the original creditor. It furnished the material that gave rise to that indebtedness, and for it, as heretofore stated, it received the bankrupt's 10 different notes, which notes it negotiated to certain banks, and upon their nonpayment took up. It is therefore claimed that it holds said indebtedness as assignee, and not as originally. The other claim which it holds amounts to the sum of $2,870.63 and is on account of staves sold and delivered by Hubbard Bros. on four separate dates between and including May 25, 1905, and July 1, 1905. A note was given by the bankrupt to said Hubbard Bros. for $1,375, covering the amount of the last sale, and this note and amounts due on account of other three sales were duly assigned to the claimant, and it asserts the whole of said indebtedness as assignee of Hubbard Bros.

The position is taken that an assignee of a materialman is not entitled to the contingent lien created by the statute in question, and that upon the happening of any of the prescribed contingencies it will not attach in his favor. The general rule, no doubt, is that the assignment of an indebtedness carries with it any security it has. This is particularly true of indebtedness secured by a mortgage or vendor's lien. It is also true of the indebtedness against a railroad company which a court of chancery will favor to the extent of giving it a preference when the railroad is placed in the hands of a receiver. An assignee of such indebtedness will be given such preference as much as the original holder thereof. Trust Co. v. Walker, 107 U. S. 596, 2 Sup. Ct. 299, 27 L. Ed. 490; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Northern Pac. R. Co. v. Lamont, 69 Fed. 73, 16 C. C. A. 364; Columbus S. & H. R. Co. Appeals, 109 Fed. 177, 48 C. C. A. 275. In the Walker Case, Mr. Chief Justice Chase said: "This case differs from that of Union Trust Company against Souther only in the fact that Walker, the present intervener and appellee, is the assignee by purchase from the original holders of the claims, which he seeks to have paid and one of the questions arising is whether, being an assignee, and not an original holder, he is entitled to payment. We have no hesitation in answering this question in the affirmative. As we have said in Fosdick v. Schall, 99 U. S. 253, 25 L. Ed. 339, these creditors are paid, not because in law they have a lien on the mortgaged property or income, but because in equity the earnings of the company constitute a fund for the payment of the expenses which their claims represent before any income arises which ought to be applied to the discharge of the mortgage debt. Under such circumstances, it is a matter of no importance that the original creditor has parted with the claim. The right is one that attaches to the debt, and not to the person of the original creditor. Consequently the right passes with an assignment of the debt." In the Lamont Case, Judge Caldwell said: "The right of preference is one that attaches to the debt and not to the person of the original creditor. Consequently the right passes to an assignee of the debt." And, in the Columbus S. & H. R. Co. Appeals Case, Judge Lurton said: "The third assignment of error in case No. 862, being the appeal of John P. McCune, trustee, should be sustained so far as to place McCune as the assignee labor claims upon the footing of the original parties. The preference attaching to a labor claim is to the claim, and not to the claimant, and passes with the claim to an assignee."

But what we have to do with here is an indebtedness secured by a statutory lien or right of priority. The question has arisen under the bankrupt act as to whether an assignee is entitled to the priority given by section 64b(4) to wages due to workmen, clerks, or servants. It has been held that he is not in the following cases, to wit: In re Westlund (D. C.) 99 Fed. 399;

In re North Carolina Car Co. (D. C.) 127 Fed. 178. The following authorities state the law as there laid down: Loveland on Bankruptcy, 726; Brandenburg on Bankruptcy, 1043; Collier on Bankruptcy, 503; 5 Cyc. 586. It has been held that he is entitled to the priority so given in the following cases, to wit: In re Brown, Fed. Cas. No. 1,974; In re C. P. Harmon (D. C.) 128 Fed. 170. The Sixth Circuit Court of Appeals has had the question before it in the case of Shropshire, Woodliff & Co. v. Bush et al., from the District Court of the Eastern District of Tennessee. Judge Clarke of that court held that the assignee is not entitled to the priority, and the Sixth Circuit Court of Appeals at its July session, 1906, certified the question to the Supreme Court of the United States for decision. 27 Sup. Ct. 178, 204 U. S. 186, 51 L. Ed. ——. In the case of In re Campbell (D. C.) 102 Fed. 686, it was held that the right to priority might be assigned after the filing of the petition in bankruptcy.

The decisions as to whether the assignee in such instance is entitled to the priority are hardly relevant to the question here. Those as to whether the assignee of a laborer or materialman is entitled to the lien conferred by a mechanic's lien or similar statute are more in point, if not decisively so. Mr. Freeman, in his note in Kinney v. Duluth Ore Co., 49 Am. St. Rep. 530, thus states the condition of the decisions on this subject in one particular: "Perfected Liens. Although there is a direct conflict in the adjudicated cases on the subject, the great weight of authority, as well as the better reasoning, is in favor of the rule that a perfected mechanic's lien may be assigned, and the assignee may thereafter enforce it in his own name, and in the same method that the assignor might have done." It has been so held by the Supreme Court of the United States in the case of Davis v. Bilsland, 18 Wall. 659, 21 L. Ed. 969. Mr. Justice Bradley there said: "The plaintiff assigns three errors: * * * Second, that the claim of a mechanic for a statutory lien cannot be enforced by an assignee by a suit in his own name. In answer to this objection it is sufficient to refer to the fourth section of the civil practice act of Montana, which provides that actions shall be prosecuted in the name of the real party in interest. McKillican has completed his claim by filing his lien before assigning it to the plaintiff. It was perfectly lawful for him to assign his claim. It was not against any principle of public policy to do so. When assigned, the claim really belonged to the plaintiff, and according to the Code he was the proper person to bring suit upon it."

Mr. Freeman in said note thus states the law on this subject in another particular: "Assignment of Right to Lien. On this topic also there is a conflict of authority, but the great majority of the cases maintain the proposition that the assignee of a claim for work and labor or material furnished cannot file the notice required by law and thereby create a lien. The right to create and perfect such lien is personal to the mechanic and cannot be assigned. Even in most of those jurisdictions where the perfected lien is capable of assignment the mere inchoate right to a mechanic's lien before the lien has been perfected by the filing of the claim is not assignable."

I regard the law as thus stated in both these particulars to be the better doctrine. The case we have here is not that of a perfect lien at the time of the assignment. It is that of a contingent lien, and attaches only upon the happening of certain contingencies; but its so attaching does not depend upon the doing of anything by the laborer or materialman which may be said to be personal to him. As we have heretofore held, there is no requirement as to his filing a statement or notice. It attaches upon the happening of certain contingencies over which he has no control and entirely independent of him. It comes, therefore, within the doctrine of the first line of decisions, and not within that of the other.

But it is claimed that we are affected here by two decisions of the Court of Appeals of Kentucky, to wit: Frailey v. Winchester, 96 Ky. 570, 29 S. W. 446; Hutsell v. Bank, 102 Ky. 410, 43 S. W. 469, 39 L. R. A. 403. In the former case it was held that the assignee of a laborer who was entitled to a lien under the act of March, 1888, now section 2492 of the Kentucky Statutes of 1903, cannot comply with section 3 thereof, now section 2494 of Kentucky Statutes of 1903, and thus preserve the lien. The laborer alone can comply therewith. Judge Paynter said: "The laborer not having done that which

the law required as a prerequisite to the attachment of a lien, no lien followed the debt into the hands of the Pryses. The lien being a statutory right, dependent upon a substantial compliance with its terms, no rule of equity can be invoked in this case to give that relief which a statute denies or fails to furnish." This case, therefore, comes within that line of cases laying down the law as set forth by Mr. Freeman in the second particular above. It is not applicable here, because the statute in question here does not require the filing of a statement or notice by the laborer or materialman, as heretofore held. In the latter case it was held that the assignee of a rent note could not collect it by what is called the "extraordinary remedy" of distress. This was so held because the remedy by distress can be exercised only by the holder of the reversion. This case, therefore, is not in point here.

It must be held, therefore, that the assignee of a laborer or materialman is entitled to the contingent lien created by the statute in question. If so, there is the greater reason that the claimants should be entitled to that lien as to the larger claim asserted by it. As to such claim, it was the original materialman. It simply negotiated the notes which it received for its claim, becoming bound as assignor to see to their payment, and upon their nonpayment it took them up and reinstated itself in the ownership of the claim. It was held by the Court of Appeals of Kentucky, in the case of Graham v. Holt, 4 B. Mon. 61, under the ordinary mechanic's lien law, which then contained the clause that the taking of security would amount to a waiver of the lien, that a mechanic who had so negotiated notes taken for his claim and regained them was entitled to his lien. Judge Marshall said: "It is contended, however, that the statute gives the lien to the mechanics and materialmen only, and that it is destroyed by the assignment of a note for the debt which it was intended to secure. We do not concede this to be a legitimate conclusion from the premises stated, nor from the additional fact that the statute provides only for the enforcement of the lien by those persons to whom it is given. The question is not to whom the lien belongs, or by whom it may be asserted in case the debt is assigned, but whether it passes wholly to the assignee, so as that he may enforce it without even making the original creditor a party, which, however, we suppose should not be allowed, or whether a beneficial interest in it passes, to be enforced in the name or with the assent of the original creditor as a party, or whether it remains wholly in the original party, who still continues responsible for the debt, and is to be enforced only when by again becoming the holder of the note he is again the creditor. The statute gives an express lien for the benefit of the mechanics and materialmen referred to. It nowhere says, however, that it shall not be assignable, or that it shall be destroyed by the assignment of the debt which it is intended to secure. Were it conceded, then, that in consequence of the particular mode pointed out for its enforcement it does not, as other express liens do, pass absolutely to the assignee of the debt, it would be depriving the statute of the beneficial operation it was intended to have to give it such construction as would prevent the mechanic or materialman from using according to the exigencies of his business, the debt, for the security of which the lien is given, but at the peril of losing the security. The statute did not intend to prohibit the taking of a note, nor to restrict the use of it, nor, as we think, to make the destruction of the lien the consequence of the transfer of the debt. If, then, it does not pass to the assignee it remains with the payee as ultimate security for the debt for which he generally becomes responsible by his assignment; and, if the debt be due and unpaid, he may, within the year, enforce the lien for his own sole benefit, if he have taken up the note, or for the benefit of himself and the assignee, if the latter is willing to indulge him by awaiting the result of that remedy."

This case is old, it is true; but that is not against it. It is true also that it has never been followed. This is because there has been no occasion to follow it, so far as the Kentucky Reports show. Nor is it inconsistent with Frailey v. Winchester, as is evident from what has been heretofore said.

I conclude, therefore, that this ground is not well taken.

In view of the line of reasoning herein put forth, I am constrained to hold that the claimant is entitled to the priority asserted, and orders will be drawn accordingly.